REGAN, Judge.
Plaintiff, Mrs. Christina Eiswirth Mon-nerjahn, instituted this suit for the use and benefit of her minor son, Wallace L. Mon-nerjahn, against the Times Picayune Publishing Company, endeavoring to recover in tort damages of $105,000 by virtue of an accident resulting in the loss of vision to one of her son’s eyes, which occurred on January 16th, 1950, at 2:30 p. m.; alternatively plaintiff requested a judgment in conformity with the provisions of the Workmen’s Compensation Act, LSA-R.S. 23:1021 et seq.
Defendant answered and, in substance, denied the allegations of the petition and called in warranty the General Accident Fire & Life Assurance Corporation, its workmen’s compensation insurer and the St. Paul Mercury Indemnity Company, its tort liability insurer.
The General Accident Fire & Life Assurance Corporation answered denying the pertinent allegations of the petition and reconvened alleging that inadvertently it had paid medical expenses incurred by Wallace Monnerjahn amounting to the sum of $579.-65, which should be refunded in the event plaintiff obtained a judgment in tort.
The St. Paul Mercury Indemnity Company answered insisting that plaintiff’s remedy, if any, existed because of the creation of the Workmen’s Compensation Act rather than an action sounding in tort; adopted the answer of the defendant and further pleaded the contributory negligence of Monnerjahn.
The judgment dismissed plaintiff’s action in tort against the defendant and the call in warranty addressed to the St. Paul Mercury Indemnity Company by the defendant; additionally there was judgment in favor of the plaintiff against the defendant for compensation at the rate of 65% of $14 per week for one hundred weeks commencing January 23rd, 1950, and dismissed the reconventional demand of General Accident Fire & Life Assurance Corporation. The judgment then provided that the call in warranty addressed to the General Accident Fire & Life Assurance Corporation by the defendant be maintained for the payment of compensation awarded plaintiff for the use and benefit of her minor *758 son, Wallace L. Monnerjahn. From this judgment plaintiff has prosecuted this appeal.
The record reveals that on or about March 14th, 1947, Wallace L. Monner-jahn was employed by the Times Picayune Publishing Company as a carrier in conformity with the terms of the following contract:
“The Publisher agrees:
“1. That it. will sell and deliver to the Carrier, as soon as is practical after publication each day as many copies of the New Orleans States weekday evening, and the Sunday Times-Picayune New Orleans States, as the Carrier may order for his route.
“2. That the Carrier shall use his own judgment in making sales.
“3. That the Carrier shall adopt his own methods for the conduct of his business and use his own judgment in making deliveries.
“4. That the Carrier shall pass on the credit risk of each subscriber on his route, and have the power to accept or reject a subscriber.
“5. That in all cases where subscribers remit the subscription price for a year, or any other period, direct to the Publisher, the Publisher shall hold such money in separate account for the Carrier, paying to the Carrier from that account on the day the Carrier pays for his paper, the pro rata share of the amount.
“6. That this contract may be can-celled by either party thereto upon not less than two weeks’ written notice to the other party.
“The Carrier agrees:
“1. To sell and regularly and promptly deliver the New Orleans States week-day evening, and Sunday Times-Picayune New Orleans States to all said subscribers on said route at the established rate therefor.
“2. To check the list of subscribers on taking over the route, and at least one week before date of termination of contract either by the Carrier or the Publisher and furnish the Publisher promptly a correct list of subscribers.
“3. To provide substitutes at his own expense.
“4. That he shall be responsible for, and make the payments for the newspapers which he obtains, whether or not he obtains payment from the subscriber. He may not return unsold newspapers.
“5. That this contract may be can-celled by either party thereto upon not less than two weeks’ written notice to the other party.
“6. That prior to giving up said route, the Carrier, shall give the Publisher written notice of his intention to do so and give necessary instructions during not less than seven '(7) deliveries to the person or persons who> may contract with the Publisher for said route.
“7. That he will regularly and promptly pay on regular carrier pay day for all copies sent to him in accordance with his orders at the established wholesale rate.”
The record also reflects that “on or about December 28th, 1949, a representative of the Circulation Department of the New Orleans States addressed a letter to plaintiff’s minor son, Wallace Monnerjahn, advising him that his contract with the Times Picayune Publishing Company, as States carrier, was terminated effective January 13, 19S0, said letter of termination, dated December 28, 1949, and signed on behalf of the Times Picayune Publishing Company by Walter G. Andrews, New Orleans States’ City Circulation Manager * *
The learned trial judge, at this point, thoroughly analyzed both the facts and the law applicable to this case in his written reasons for judgment which, in our opinion, encompass the case so fully that we adopt them as our own.
*759 “The facts surrounding the injury of young Monnerjahn are as follows: Wallace Monnerjahn went to the substation of the Times-Picayune Publishing Company located at 7329 Birch Street in the City of New Orleans for the purpose of settling his account for the New York Daily News with the manager of the substation. The New York Daily News account was an individual enterprise of the manager of the substation, Mr. Scheuermann, and had nothing to do whatsover with his duties nor the business which he conducted for the defendant publishing company. While in the premises of the substation and at about 2:30 P.M. on the date of January 16th, and just after having settled his personal account with Mr. Scheuermann, Mr. Scheuermann requested young Mon-nerjahn to deliver the newspapers of another carrier, Harold Schnauder, who was incapacitated because of the fact that he had broken his arm. This young Monnerjahn agreed to do. At this time Mike Osborn, another newspaper carrier of the Times-Picayune who was under contract to deliver to subscribers newspapers was opening a bundle of papers. In order to do so Osborn used a pair of pliers to remove the steel wire or strap that bound the papers. Osborn threw the wire in the direction of a bin and hit young Mon-nerjahn in the left eye, and this accident caused young Monnerjahn to sustain a complete and permanent loss of vision of this eye. After being struck in the eye young Monnerjahn helped another contract carrier who •was on the premises, John Hansen, to fold the newspapers that Hansen was to deliver at a later time.
“From the agreed statement of facts and the depositions found in the record it appears that the custom of the defendant company was to deliver the newspapers to its substation for the purpose of unbinding the papers and folding them in getting ready to deliver them on their route. Although the record is not clear it appears from the statements of counsel that the custom was that after the papers were folded they were either taken by the ■boys themselves and delivered, or if there were a great many papers to be delivered by one boy or a number of boys the defendant company would bring the newspapers to a place designated in the parlance of these contract carriers as the ‘spot.’ The ‘spot’ to which young Hansen’s papers and those of Schnauder were to be delivered on this particular afternoon by the defendant company was on Cherokee and Benjamin Streets, some thirteen blocks from the substation.
“It is the contention of the plaintiff that young Monnerjahn had not entered upon any duties for the defendant company, and accordingly that he is not covered by the Workmen’s Compensation Act and the Street Trade Act — that is Act 154 of 1948 [LSA-R.S. 23:271 et seq.] — although the plaintiff herself asks alternatively for compensation. Plaintiff contends that she is entitled to damages for the loss of her minor son’s eye because Mike Osborn was an employee of The Times-Picayune Publishing Company and not an independent contractor, and that as an employee of The Times-Picayune Publishing Company Osborn negligently threw the wire which caused young Monnerjahn to lose his eye.
“With this contention the Court cannot agree. Plaintiff herself alleges that Osborn was a contract carrier under a contract identical with the one recited in plaintiff’s petition. According to the testimony of Donald W. Coleman, a witness for the defendant, defendant exercised no independent control over their contract carriers and the contract itself in Paragraph II states that the carrier shall use his own judgment in making sales, and Paragraph III states that the carrier shall adopt his own methods of the conduct of his business and use his own judgment in making deliveries. The pub *760 lisher agrees to sell and deliver to the carrier * * * New Orleans States each weekday evening and the 'Sunday Times-Picayune-New Orleans States as the carrier may order for his route, and the carrier agrees to sell and regularly and promptly deliver the papers aforementioned to all subscribers on the route.
“As stated in the case of Allgood v. Loeb, [La.App.], 22 So.2d 568, the important question is whether from the nature of the relationship the employer had the right to supervise and control the movements of the employee. From the record in this case, that is the agreed statement of facts and the depositions, it does not appear that the defendant had the right to supervise and control the movements of these contract carriers.
“The Court is of the opinion, however, that the plaintiff’s minor son is entitled to workmen’s compensation. He was hired approximately 2:30 P.M. on January 16, 1950. The record shows that the news carriers reported to the substation for the purpose of receiving their papers and that Osborn was taking the wire, binding from his papers just previous to the accident. The record further shows that the news carriers .fold their papers at this substation. This being the case, even though young Monnerjahn had not at the time of the accident folded any papers, nor did he ever fold a paper to be delivered by him as a substitute for Schnauder, he was on the ■premises of the defendant and had been hired by its substation manager to deliver these papers from the ‘spot’ at Cherokee and Benjamin Streets, and that he did not arrive at the ‘spot’ until approximately one hour later and that he only helped Hansen as a favor deliver’s Hansen’s papers prior to the time that he complained to the manager of his eye hurting him. This Court finds that he was in the employ of the defendant from the time that its manager made the agreement with him to deliver the substitute route, and that he was on the premises of the defendant from the time that he finished transacting his business with the manager with reference to the New York Daily News as an employee of the defendant, and as such undoubtedly young Monnerjahn was subject to the orders of the substation manager (he having no contract).
“Only a short time was to ■elapse, one hour or one hour and a half, until young Monnerjahn was to report to the intersection of Cherokee and Benjamin Streets; and this Court is of the opinion that he is covered by the terms and provisions of the Street Trade Act. That is Act 154 of 1948, Revised Statutes 27 ¡271-274 [LSA-R.S. 23:271-274], He had been hired as an employee; he was on the premises of the defendant where activities were taking place with reference to the defendant’s business, and particularly the handling prior to delivery of the newspapers of the defendant. After the accident he remained on the premises of the defendant helping another contract carrier, and only a short time remained before he was to report to the intersection of Cherokee and Benjamin Streets. It would be drawing too fine a distinction in this case in this Court’s opinion to say that young Monnerjahn was not covered by the Act simply because he had not started to walk to the intersection of Cherokee and Benjamin Streets, especially in view of the testimony of Donald Coleman with reference to the delivery of the papers to the news carriers at the substation and also that of Mr. Scheuermann at Page 16 that his duties as supervisor were to give out the papers to all the boys on each of the routes at the substation.”
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.
McBRIDE, J., absent, takes no part.