305 So.2d 547 (1974)
John C. VERRETT, Indiv., and as Administrator of the Estate of his minor child, Karen Marie Verrett
v.
HOUMA NEWSPAPERS, INC., and U. S. Fidelity and Guaranty, Inc.
No. 10036.
Court of Appeal of Louisiana, First Circuit.
December 16, 1974.
*548 Timothy C. Ellender, Houma, for appellant.
Lloyd Bourgeois and Ronald Myers, Houma, for defendants-appellees.
Richard Deas, New Orleans, for Tunnelcenter, Inc. and Sentry Ins., a Mutual Co.
Before LANDRY, BLANCHE and NEHRBASS, JJ.
LANDRY, Judge.
Plaintiff (Appellant) appeals dismissal of his claims for damages for personal injuries sustained by his minor daughter, Karen Marie Verrett, when the child was struck by a bicycle being operated by Henry Matherne, a 15 year old newsboy delivering The Houma Courier, a daily newspaper published by defendant, Houma Newspapers, Inc. (Houma), the insured of U. S. Fidelity and Guaranty, Inc. (USF& G), which insurer is also made defendant herein. Appellant also named as defendant Tunnel Center, Inc. (Tunnel), owner of the shopping center parking lot situated in Houma, Louisiana, in which the accident happened, and Tunnel's insurer, Sentry Insurance, a mutual company. Houma and USF&G answered denying negligence on Matherne's part; asserting contributory negligence on the part of plaintiff; alleging that Matherne was an independent contractor for whose actions Houma was not legally responsible, and asserting a reconventional demand against plaintiff. Tunnel and Sentry answered denying liability, and also made a reconventional demand against plaintiff and third partied Houma and USF&G. Following trial on the merits adversely as to all parties, the trial court, without assigning written reasons for judgment, dismissed plaintiff's claims against all defendants, and also rejected all reconventional and third party demands. In oral argument before this court, counsel suggests that the trial court pretermitted the agency question posed by Houma and USF&G, and relieved defendants of liability on the ground that plaintiff failed to make a showing of negligence on the part of any defendant. The appeal lodged herein has been dismissed as to Tunnel and Sentry. We are concerned, therefore, only with the demands asserted against Houma and its insurer. We affirm dismissal of plaintiff's action against these remaining parties upon concluding that Henry Matherne was an independent contractor.
The accident occurred on March 3, 1971, at approximately 4:30 P.M. in the parking lot of the Winn-Dixie Shopping Center, which facility is owned by Tunnel and situated on Tunnel Boulevard, Houma, Louisiana. At the time, Mrs. Verrett had gone to the Winn-Dixie store to shop. She was accompanied by her seven year old daughter, Karen Marie, a young son John, her fourteen year old nephew, Richard Verrett, and other members of her family. Mrs. Verrett left the two children, Karen Marie and John, in the store with Richard while Mrs. Verrett went out to put some groceries in the car. While Mrs. Verrett was *549 thus engaged, Karen Marie emerged from the store with Richard. The child somehow darted into an automobile lane of travel and was struck by Matherne's bicycle. Matherne lived nearby and was traveling through the parking lot to commence his route. At the time, the basket of Matherne's bicycle was heavily loaded with approximately 200 newspapers.
There is no real dispute concerning the circumstances attending the relationship between Matherne and Houma. The testimony of Houma's circulation manager, Derwood Ducote, establishes that Houma engaged approximately 102 carriers, each of whom is leased a subscriber's list and route for delivery of Houma's daily newspaper. It is customary that each carrier sign a written lease agreement which, in the case of minors, must also be signed by the carrier's parents. Of the 102 carriers engaged, all, save one or two which were overlooked, eventually signed a lease agreement. It is conceded, however, that no such agreement was signed by Matherne. A copy of Houma's standard carrier contract, executed by carrier David Andrus and his mother, appears of record. The contract recites that the carrier is leased a subscriber's list. As consideration therefor, carrier agrees to deliver newspapers to the subscribers regularly and promptly and to promote circulation of the newspaper. Carrier agrees to give Houma two weeks notice of intent to abandon the route. Houma is granted authority to cancel the lease at any time for cause. Carrier agrees to post a bond of $5.00 per month to insure payment of any amount due Houma. The bond is refundable to carrier upon complete liquidation of all amounts owed Houma. Newspapers are sold by Houma to carriers for approximately 75 cents monthly per subscriber. Carriers charge each subscriber Houma's recommended price of $2.15 monthly; the difference between the carrier's cost and selling price is the carrier's profit. In addition to newspapers, carriers are also sold rubber bands to aid in folding newspapers and plastic sleeves for the protection of papers during inclement weather.
No salaries or commissions are paid carriers by Houma. Occasionally, Houma staged contests in which prizes consisting of bonds and week end vacation trips were awarded a carrier or carriers for obtaining additional subscribers. Any loss due to failure to collect from subscribers is at carrier's expense. In those instances where subscribers pay directly to Houma, records thereof are kept by Houma. On the 7th of each month, Houma bills each carrier for papers sold during the previous month. The monthly $5.00 per month bond charge is added to the bill together with the cost of all rubber bands and plastic sleeves furnished. From the total due, Houma deducts all payments received from subscribers. The balance is paid by the carrier out of his collections.
Houma does not include the names of carriers on its payroll of employees. No state or federal income tax and no social security payments are collected by Houma. Neither are such taxes withheld by Houma in any manner whatsoever. No control is reserved or exercised by Houma over the manner in which the carriers deliver their papers. As each carrier is engaged, it is made clear to him that Houma is not interested in how he performs his deliveries, and that the carrier may utilize any form of transportation or locomotion he desires. Deliveries are required to be made during certain hours and leases are terminated by Houma for continued serious violation of this requirement. An employee of Houma's circulation department daily delivers each carrier's papers in a bundle to a designated spot (usually the carrier's home). From there, the carrier accepts the papers and commences delivery in his own fashion.
While it is conceded that no written lease was signed by Henry Matherne, it is undisputed that Ducote and Leo Harp, former employees of Houma's circulation department, each talked with Henry Matherne *550 and/or Henry's parents on at least one occasion prior to Henry commencing his route. On these occasions, the details of the relationship between Houma and its carriers were explained to Matherne and his parents substantially as outlined above.
Young Matherne corroborated in substance the testimony of Ducote and Ray Dill, Houma's publishers, to the effect that Houma exercised no control over the manner in which carriers made their deliveries or conducted their routes; that Matherne purchased his papers and supplies from Houma; that Matherne was solely responsible for collecting from subscribers and was required to absorb all losses from uncollected accounts, and that basically, Houma was interested only in results, namely, regular and prompt delivery of papers, within certain hours of the day, not the method or system employed by carriers to achieve the desired result.
The test for determining whether an individual is an independent contractor or an employee was set forth by the Supreme Court in Amyx v. Henry & Hall et al., 227 La. 364, 79 So.2d 483, as follows:
"The term `independent contractor', as was said in the case of Gallaher v. Ricketts, La.App., 187 So. 351, 355, `connotes a freedom of action and choice in respect of the undertaking and a legal responsibility on the part of the contractor in case the agreement is not fulfilled in accordance with its covenants.' A contractee-independent contractor relationship presupposes a contract between the parties. It likewise presupposes the independent nature of his business, and is not exclusive as to the means whereby it is accomplished. It should appear that the contract calls for a specific piecework as a unit to be done according to his own methods, without being subject to the control and direction, in the performance of the service, of his employer, except as to the result of the services to be rendered. It must also appear that a specified price for the overall undertaking is agreed upon; that its duration is for a specified time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.
"It is well settled by our jurisprudence that besides other factors, the most important test in determining `whether a person employed to do certain work is an independent contractor or a mere servant is the control over the work which is reserved by the employer.' It is also well settled that whether the employer `actually exercises control or supervision' over the movements and the services rendered by the employee, such a fact is of no great moment, the `important question is whether, from the nature of the relationship, he had the right to do so.'"
The rule is more tersely stated in Shelton v. Barber Brothers Company, La.App., 94 So.2d 489:
"As contrasted to an employee, an independent contractor is one independent in business who contracts to perform a specified piece of work for another for a specified price, without being subject in the performance of the contract to the control and direction of his employer except as to the result contracted for; which contract is not subject to termination or discontinuance at the will of either party without a corresponding liability for its breach. Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483. In the cited case's comprehensive summary of the distinction between the relationships, our Supreme Court through Mr. Justice Simon remarked that `the most important test * * * is the control over the work which is reserved by the employer', 79 So.2d 486; concluding that the right of control, rather than the actual control exercised, was the important criterion."
In Monnerjahn v. Times Picayune Pub. Co., La.App., 67 So.2d 756, a case analogous to the one at bar, it was held that a carrier, operating pursuant to a written contract similar to that used by Houma in *551 this case, was an independent contractor inasmuch as no right of control over the activities of the carrier was retained by defendant newspaper.
In this instance, it is established beyond doubt, by the testimony of Ducote and Henry Matherne himself that Houma did not reserve or retain any right of control whatsoever over the manner in which Matherne made his deliveries of newspapers. Matherne frankly conceded that Houma was interested in results only, that is, prompt and regular delivery of newspapers within a reasonable time limitation. Since the basic and most important element of employer-employee relationship, namely, the right to control, is absent in this instance, matherne cannot, in legal contemplation, be deemed Houma's employee.
The judgment of the trial court is affirmed at Appellant's cost.
Affirmed.