## Richmond

### RICHMOND NEWSPAPERS, INC.

### V.

### JOHN F. GILL, ADMINISTRATOR, ETC.

September 9, 1982.

Record No. 811231.

Present: All the Justices.

94

*Alexander Wellford (Andrew J. Brent; Mary T. Metil; Christian, Barton, Epps, Brent & Chappell,* on briefs), for appellant.
*James F. Parkinson, III (Paul, Smith and Blank,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

John W. Gill died November 28, 1979, from injuries sustained in an automobile accident which occurred September 6, 1979, in Sussex County while he was delivering newspapers published by Richmond Newspapers, Inc. (RNI). The Industrial Commission affirmed a hearing commissioner's award to John F. Gill, the decedent's administrator, for workmen's compensation benefits, medical costs, and funeral expenses. The sole issue raised by RNI on appeal is whether Gill had been its employee, as the Commission

ruled, or an independent contractor, as RNI contends. "[C]onclusions of the Commission upon questions of law, or mixed questions of law and fact, are not binding on us." *Brown* v. *Fox,* 189 Va. 509, 517, 54 S.E.2d 109, 113 (1949).

On August 9, 1979, RNI and Gill entered into a written agreement labeled "Route Carrier Contract". Gill undertook to "service . . . subscribers in a proper and reasonable manner" through "prompt delivery" of RNI's newspapers. The contract set out in detail a route designated as Gill's "area of primary responsibility".

The "Subscription List" furnished Gill was "the sole and exclusive property of RNI", but he was authorized to supplement the initial list by reporting to RNI the names and addresses of any new subscribers. Gill could decline "to make . . . delivery and sale" to any subscriber on RNI's list, provided he notified RNI in writing of "good and reasonable cause" for his action. If, however, Gill failed on a given day to make prompt delivery of the paper to any other named subscriber, RNI reserved the right "to furnish a copy to such subscriber, charging the actual cost of the copy and its delivery" to Gill.

Gill agreed to purchase newspapers at the wholesale rates fixed "from time to time" by RNI. He was required "to promptly pay in full" RNI's periodic billings computed at "wholesale rates less a discount of $220.00" and "to establish a bond equal to at least twice the size of the normal gross billing period." It was Gill's duty to make collections from regular customers, and RNI agreed that he would "be given credit . . . at each billing settlement" for "any subscriptions paid in advance to RNI". The contract made no provision for any loss Gill might sustain on account of unsold papers or unpaid subscribers' debts.

Gill was forbidden to "assign [the] contract or his rights and/or duties [there]under without the prior written consent of RNI." The contract was terminable by either party upon "three weeks prior notice" or "immediately in the event of a breach by the other party of any of the [contract's] provisions or obligations". RNI reserved the right to terminate immediately if average daily circulation decreased by more than five percent or if Gill refused to accept RNI's adjustments in the wholesale price of its newspapers.

Paragraph seven of the contract provided:

The Route Carrier is a separate independent contractor and is responsible for providing the equipment and/or supplies necessary for the satisfactory performance of this contract and so long as the goodwill, business reputation, or circulation of RNI and/or its Newspapers is not injured thereby, shall conduct his business as he deems best, according to his own means and methods, without the supervision or control of RNI. However, RNI, in order to maintain and promote the goodwill and quality of its Newspapers with readers, advertisers and others, has the right to require the prompt delivery of such Newspapers, and any newspaper sold hereunder, to subscribers on the Subscription List and to determine what constitutes a complete newspaper package, and the Route Carrier shall not add material to or subtract material from such complete newspaper package prior to resale or delivery by him. Further, if the Route Carrier is unable to make such prompt delivery for any reason, he shall provide a substitute over whom the Route Carrier shall have full and complete control and responsibility. The Route Carrier shall not be required to perform any services for RNI other than those set forth in this contract, and RNI shall not have an exclusive right to the Route Carrier's services.

The contract was admitted into evidence, and the commissioner heard the testimony of several witnesses. Marcus Jones, a circulation representative for RNI, testified that he was informed in August 1979 that Gill was "interested in a route." The Waverly route was open at that time, and Jones contacted Gill, who rode with him for three days to learn which houses received the morning paper. Thereafter, Jones "contracted [Gill] and let him go by himself". Several days after Gill signed the agreement, Jones showed him how to operate the coin mechanisms on three vending boxes located at business establishments along the route. Gill was not required to maintain these boxes but had elected to do so. Jones saw Gill on only one other occasion, when he took Gill certain supplies he had ordered. The cost of such supplies was charged to Gill in RNI's periodic billings.

RNI's ledger on Gill's account for 22 days in August showed that Gill had been billed $510.84 for the cost of newspapers and had been given two credits. The first, $157.00, represented the discount authorized by the contract adjusted for a partial month, and

the second, $40.60, the cost of newspapers Gill had delivered to prepaid customers. Other charges on the August ledger, verified by RNI records, included: plastic bags, $0.65; rubber bands, $1.20; rubber stamps, $4.15; and billing envelopes, $4.40. The ledger showed that Gill had paid RNI the net balance due on the August billing.

The newspapers Gill bought were transported in bulk by contract haulers and a contract route carrier who deposited them at points convenient to Gill's route. Gill was required to furnish his own transportation, and the evidence showed that he was driving his own vehicle at the time of the accident. He was accompanied by two other people who were helping him deliver papers. Following the accident, an RNI district supervisor "took care of the route". He was on RNI's payroll and received a weekly check from which taxes were withheld. He was also entitled to company fringe benefits. The terms of Gill's contract did not allow for a paid vacation or any other benefits except an accident insurance policy which he was privileged to purchase at his own expense.

We begin our analysis by reviewing the statutory and case law bearing upon the question at issue.

Independent contractors or subcontractors are "not countable as employees within the meaning of the Workmen's Compensation Act. . . . [T]he Act applies to the contractual relationship of master and servant." *Stover* v. *Ratliff,* 221 Va. 509, 511, 272 S.E.2d 40, 42 (1980).

With certain exceptions not relevant here, "every person . . . in the service of another under any contract of hire or apprenticeship, written or implied," is an "employee" for purposes of the Act. Code § 65.1-4. But whether a person is an employee or an independent contractor "is governed, not by any express provision of the workmen's compensation law, but by the common-law."[1] *Hann* v. *Times-Dispatch Pub. Co.,* 166 Va. 102, 105, 184 S.E. 183, 184 (1936). The Act "does not undertake to change, as between themselves, the rights of owners and independent contractors. This statute leaves that relationship as it was at common law and we must look to it in determining who is master and who is servant." *Crowder* v. *Haymaker,* 164 Va. 77, 79, 178 S.E. 803, 804 (1935).

---

[1] The Act also covers certain "statutory employees" unknown to the common law. *See* Code §§ 65.1-30, -31, -32. These provisions of the Act are irrelevant to our inquiry here.

■ As a general rule, a person is an employee if he works for wages or a salary and the person who hires him reserves the power to fire him and the power to exercise control over the work to be performed. The power of control is the most significant indicium of the employment relationship; other factors merely help to elucidate the manner and degree of control. *See Baker* v. *Nussman,* 152 Va. 293, 303-04, 147 S.E. 246, 249 (1929).

■ But an employer-employee relationship exists only if the control reserved includes the power to control, not only the result to be accomplished, but also the means and methods by which the result is to be accomplished.

> "If under the contract the party for whom the work is being done may prescribe not only what the result shall be, but also direct the means and methods by which the other shall do the work, the former is an employer, and the latter an employee. But if the former may specify the result only, and the latter may adopt such means and methods as he chooses to accomplish that result, then the latter is not an employee, but an independent contractor. So the master test is the right to control the work. . . ."

*Craig* v. *Doyle,* 179 Va. 526, 531, 19 S.E.2d 675, 677 (1942) (quoting *Kelley's Dependents* v. *Hoosac Lbr. Co.,* 95 Vt. 50, 53, 113 A. 818, 820 (1921)). *See also Epperson* v. *DeJarnette,* 164 Va. 482, 180 S.E. 412 (1935).

With these principles in mind, we examine the written contract between the parties and the evidence concerning performance under that contract.

■ The contract provides that "[t]he Route Carrier is a separate independent contractor". Such a recitation is not self-executing. If, in consideration of all material factors, RNI was Gill's employer, then such a contractual declaration would not relieve it of any obligation created by the Workmen's Compensation Act. *See* Code § 65.1-37.

But the nature of the relationship the parties intended to create is one of the factors to be considered, and a written declaration subscribed by the parties is relevant evidence of that intent. One person may elect to assume a servant's status while another prefers to be his own master. When courts can determine that choice, they should accord it due deference.

It is a truism that the name chosen by the parties to describe their relationship is ordinarily of very little importance as against the factual rights and duties they assume. A plain statement that the parties intend the relationship of independent contractor and not employee is not entirely to be disregarded, however. In a close case, it may swing the balance by aiding in establishing the true intent of the parties - and, after all, that intent is entitled to considerable respect if it can be accurately ascertained. . . . [I]t is quite possible that the worker honestly does not want to be an employee; and paternalism should not be carried so far that the state says to him, "We do not care what you want; we think employee status with compensation protection is better for you."

1C A. Larson, The Law of Workmen's Compensation § 46.30 (1980) (footnote omitted).

The Commission ruled as a matter of law that RNI had "the right to control the carrier's activities to a degree sufficient to establish his status as an employee of the company". We will discuss the reasoning underlying that ruling later. Preliminarily, we consider whether Gill was a wage-earner and whether he was subject to peremptory discharge by RNI. The record shows that he was neither.

A business retailer buys his merchandise from a wholesaler at wholesale prices; Gill bought his papers at wholesale prices and posted a bond to secure prompt payment. A retailer sells his merchandise at a price higher than cost; Gill did the same. Unless a retailer takes merchandise on consignment, he assumes the burden of ownership of unsold items; Gill assumed that burden. A retailer bears the risk of non-collection of accounts receivable; Gill bore that risk. A retailer, working alone or with the assistance of others, incurs various expenses in the conduct of his business. If he is a prudent manager, he may earn a profit. If not, he may sustain a loss. The same was true in Gill's business. Granted, Gill was allowed a discount against the monthly charges RNI assessed against him, but that did not amount to a guaranteed monthly wage. Had Gill been injudicious in the management of his business affairs, he could have sustained a loss greater than the amount of his discount.

Just as a retailer could not fairly be characterized as a wage-earner, Gill could not.

■ The right to discharge is an element of the power to control performance. An absolute right to discharge without cause or notice includes the power to compel obedience to instructions as given and, accordingly, is one of the earmarks of the employer-employee relationship. While an employer-employee relationship may be created by contract notwithstanding express limitations upon the employer's right to terminate the relationship, such limitations are more characteristic of contracts negotiated by independent contractors. *See Griffith* v. *Electrolux Corp.,* 176 Va. 378, 396, 11 S.E.2d 644, 652 (1940). Such limitations appear in the route carrier contract. RNI could terminate its relationship with Gill without notice but only if Gill failed to maintain the prescribed daily circulation, objected to a change in wholesale prices, or breached "any of the provisions or obligations" of the contract. Otherwise, RNI could terminate only upon "three weeks prior notice".

Hence, although these limitations upon RNI's rights of termination may not be inconsistent with the existence of an employer-employee relationship, they do not establish it, and we turn our attention to the "master test".

■ The Commission in its opinion and Gill on brief point to several facts as indicia of RNI's power of control. RNI required Gill to deliver newspapers promptly to all subscribers on its list; to provide a substitute if he was personally unable to do so; to maintain the physical integrity of the newspaper package he delivered; to maintain circulation at a prescribed level; to conduct his business in a manner which did not injure RNI's "goodwill, business reputation, or circulation"; and to post a bond securing payment of the money he owed RNI. RNI reserved ownership of the subscription list, and Gill was forbidden to assign his contract without RNI's written consent.[2]

We agree that these facts are indicative of RNI's power of control. But they relate, primarily, to RNI's power to control the result sought to be accomplished. The question remains whether RNI reserved the right to exercise control over the means and methods of accomplishment.

---

[2] In finding that Gill was RNI's employee, the Commission relied, in part, upon the fact that Gill's route had formerly been "serviced by an acknowledged employee of RNI." But, unlike Gill, such employees worked for wages, taxes were withheld from their earnings, and they were entitled to vacations and other fringe benefits.

We find no significance in the Commission's observation that "RNI has the right to control the route which the carrier was required to follow". The geographical description of the "area of primary responsibility" was merely a definition of the job territory of the contract, not a limitation upon the manner in which Gill served his customers within that area. Gill was authorized to "conduct his business as he deems best, according to his own means and methods, without the supervision or control of RNI". Thus, Gill could commence and complete deliveries at any points along the prescribed route which best suited his convenience. No particular work hours were specified, and since RNI expressly relinquished any claim to "an exclusive right to the Route Carrier's services", Gill was free to engage in as many vocations as he pleased. Gill was not required to perform delivery duties in person but was authorized to engage helpers or substitutes, and RNI reserved no right to pass upon the qualifications of those he chose.[3]

Gill provided and maintained the equipment used in the delivery operation and bought the supplies required. Gill billed the customers he served, made the collections from the subscribers and the vending machines, and, after paying the expenses of doing business, retained whatever profit he earned, all without interference or supervision by RNI. Indeed, the testimony shows that, after the contract was signed, RNI representatives met with Gill only twice.

Considering the circumstances disclosed by the evidence and examining the route carrier contract in all its parts, we conclude that RNI reserved and exercised virtually no control over the means and methods Gill employed in the conduct of his business.

In *Hann v. Times-Dispatch Pub. Co.*, 166 Va. 102, 184 S.E. 183 (1936), a newspaper delivery boy was injured while riding as a passenger in a car operated by his supervisor, an employee of the publisher. Rejecting Hann's claim that he was an independent contractor, the trial court ruled that he was an employee covered by the Workmen's Compensation Act, and we affirmed the judgment.

Gill insists that our decision there controls the issue here. We disagree. The cases are superficially similar, but as we cautioned in our opinion, in determining the status of one who performs

---

[3] "The right to substitute another to do the work is indicative of an independent contractual relation, whereas personal service is a marked characteristic of the relation of master and servant." 41 Am. Jur. 2d *Independent Contractors* § 23 (1968).

work for another, "[n]o hard and fast rule can be laid down. . . . It must be determined from the facts of the particular case in light of well settled principles." *Id.* at 105-06, 184 S.E. at 184. Here, the principles are precisely the same, but the facts are markedly different.

Without repeating the facts in the case at bar, we note the crucial points of distinction they bear to the facts stated in our opinion in *Hann.* Hann's supervisor dealt with Hann and other newsboys on a daily basis. Hann was required to report for work at 5:30 a.m. and to complete his deliveries by 7:00 a.m. If he was late for work, his supervisor picked him up in his car and drove him to the starting point of his route. Hann delivered only the newspapers sorted and allocated to him daily by his supervisor. Hann was not allowed to deviate from his designated route. He could not sublet his work to others. And "Hann was subject to discharge at the will of the supervisor." *Id.* at 106, 184 S.E. at 185.

While the publisher in *Hann* reserved and exercised the power of continuing control over the means and methods of performance, RNI contracted for a defined result and relinquished such power. We reaffirm our decision that Hann was an employee, and we hold that Gill was an independent contractor.

Accordingly, we will reverse the award and enter final judgment here for RNI.

*Reversed and final judgment.*