377 S.E.2d 479

**HUNTINGTON PUBLISHING COMPANY, Appellee,**

v.

**Michael E. CARYL, Tax Commissioner, etc., Appellant.**

**No. 18482**

Supreme Court of Appeals of West Virginia.

Dec. 8, 1988.

Rehearing Denied Feb. 22, 1988.

Charles G. Brown, Atty. Gen., Mary Carol Holbert, Senior Atty. Gen., for appellant.

Noel P. Copen, David L. Campbell, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, for appellee.

NEELY, Justice:

In 1980, the State Tax Commissioner issued an assessment against the Huntington Publishing Company under the old West Virginia business and occupation tax, *W.Va.Code*, 11–13–1 *et seq.* (repealed effective 1 July 1987) for $59,940.34 in tax, $831.93 in interest and $19,116.55 in penalties. After an administrative hearing, the commissioner modified the assessment to waive all penalties.

Huntington Publishing appealed the commissioner's decision to the Circuit Court of Kanawha County, which reversed the administrative decision by final order entered

24 March 1988. The tax commissioner appealed here, and the question before us now is whether the appellee's distribution of its newspapers to subscribers through youth and adult carriers constituted retail sales under *W. Va. Code*, 11–13–2c [1971]. We find that the appellee's activities did constitute retail sales and reverse the circuit court.

## I.

The Huntington Publishing Company is a West Virginia Corporation whose primary business is the publishing and sale of newspapers. The controversy before us centers in the relationship between the corporation and the carriers who deliver the majority of its newspapers to the ultimate customer. The petitioner has two classes of carriers: (1) youth carriers; and (2) motor route or adult carriers. Youth carriers make only home deliveries and do so on foot or bicycle. The motor route carriers make both home deliveries and single copy sales, and use a motor vehicle in their distribution. Single copy sales are those made to merchants and through vending machines known as "racks." Single copy sales comprised roughly 19.62 percent of motor route carrier sales, and the tax commissioner vacated the assessment as it applied to these single copy sales.[1]

Huntington Publishing delivers its newspapers to a carrier's home or to a point near a carrier's route, at which time the carrier is liable for the "wholesale" price of the newspapers. If the newspapers are stolen, destroyed or the carrier is unable to collect from a retail customer, the carrier is still liable for the payment to Huntington Publishing.

The carrier incurs liability if Huntington Publishing delivers a newspaper on his behalf. If a carrier fails to pick up his newspapers, or a customer complains to the appellee of non-delivery, the appellee's district sales manager makes the delivery. The carrier is then charged for the delivered newspapers at the retail rate.

Huntington Publishing exerts no control over the carriers' method of delivery. The carriers are free to hire assistants or substitutes and can deliver material in addition to the appellee's newspaper, provided the material does not appear to be part of the newspaper. The carrier decides whether the newspapers are folded or wrapped with rubber bands. The carriers can buy carrier bags and rubber bands from the appellee but are under no duty to do so. Although the carrier may determine the retail price of the newspapers, in almost all instances, the carriers charge the "suggested" price published in the newspaper.[2]

The "suggested" time for deliveries is 6:30 a.m., Monday through Saturday, and 7:30 a.m. on Sunday. It is to the carriers' advantage that they deliver by the "suggested" time because the appellee may view a late delivery as a non-delivery, make the delivery itself, and charge the carrier the retail amount.

The appellee is involved in the carrier-customer relationship in several ways. The appellee provides free delivery tubes for motor route customers and provides receipt books to all carriers. The appellee also accepts new orders and pre-paid subscriptions for carrier delivery. New orders are assigned to carriers. Pre-paid subscriptions are retained by the appellee and credited to the carriers' accounts on a bi-weekly basis. The pre-paid subscriptions are billed at the "suggested" retail price.

## II.

The appellee's position is that the route carriers are independent contractors to whom wholesale sales of newspapers are made, and who in turn make retail sales of the newspapers to the ultimate consumers.[3]

1. Such sales, unlike home delivery sales, have indicia of *true* wholesale sales to the adult carriers, who in turn sell the papers at retail to merchants or through vending machines.

2. The appellee cited one instance where a carrier charged a price different from the "suggested" price.

3. Appellee's relationship with the carriers is governed by the "Independent Carrier Agreement." This agreement, along with the required surety

In accordance with *W. Va. Code,* 11–13–2c [1971], then, the appellee contends that it is required to report only its income under the manufacturing classification found in *W. Va. Code,* 11–13–2b [1974].

*W. Va. Code,* 11–13–2b [1974] imposed the business and occupation tax on the publishing of newspapers. The amount of the tax was equal to the value of the newspapers, as shown by gross proceeds derived from their sale by the publisher, multiplied by eighty-eight one hundredths of one percent. *W. Va. Code,* 11–13–2 [1971, 1975] provided that any person exercising any privilege taxable under *Code,* 11–13–2b [1974] in selling his product at retail also paid the tax imposed by *W. Va. Code,* 11–13–2c [1971]. *Code,* 11–13–2c [1971] imposed a tax upon every person engaging within the State of West Virginia in the business of selling any tangible personal property whatsoever. In the case of a retail sale, the tax levied was fifty-five one hundredths of one percent of the gross income.

The assessment at issue in this case taxed as retail sales the income derived from sales of newspapers delivered by route carriers to subscribers. It is not disputed that the sale to the subscriber, who is the ultimate consumer, is a retail sale. Reg. BOT § 1.2c(B). *W. Va. Code,* 11–15–9(12) [now *W. Va. Code,* 11–15–9(m)] exempts sales of newspapers delivered by route carriers from the consumers sales and service tax.

The sale of newspapers to consumers when *delivered* by route carriers is a retail sale. Under *Code,* 11–15–9(12) [now *W. Va. Code,* 11–15–9(m)], sales of newspapers *delivered* by route carriers are exempt from the consumer sales and service tax. But in

bond, were admitted as appellee's Exhibit No. 1 and read as follows:

THE HUNTINGTON ADVERTISER Route
# ____
AND
The Herald Dispatch
INDEPENDENT CARRIER AGREEMENT
THIS AGREEMENT is made on the ____ day of _____, 19____, at _____ between THE HUNTINGTON PUBLISHING CO., a corporation, hereinafter called 'the Company' and _____ of _____ hereinafter called the 'Carrier'.
WHEREAS, the Company is the publisher of _____, and the Carrier desires to engaged [sic] in the independent business of purchasing the Company's newspapers and selling and distributing same, the parties therefore mutually agree as follows:
1. The Company agrees to furnish the Carrier with a delivery schedule, and the Carrier agrees to deliver complete newspapers to all points on such schedule.
2. The Company agrees to sell, and the Carrier agrees to purchase sufficient quantities of newspapers to cover the delivery schedule, together with such additional quantities of newspapers as the Carrier may require in conducting his independent business of selling and delivering the Company's newspapers.
3. The Carrier agrees to pay the Company the balance due for all newspapers supplied or delivered to the Carrier on _____ at the then prevailing wholesale rates for such newspapers. The Company, upon 7 days notice, may change such rates in accordance with a general increase or decrease of said wholesale rates.
4. It is understood that the Carrier is free to engage in other business activities, but he agrees that the Company's newspapers will be delivered in a timely manner in accordance with said delivery schedule. The Carrier agrees that he will insert no foreign matter into such newspapers without the prior consent of the Company.
5. The Company and Carrier agree that either party may terminate this Agreement upon fifteen (15) days written notice, or such shorter time as may be mutually agreed upon.
The *HUNTINGTON PUBLISHING* Company
FOR THE COMPANY _____
ADDRESS _____
DATE _____
CARRIER _____
ADDRESS _____
DATE _____
_____
(Circulation Director)
SURETY BOND
(If Carrier is a Minor)
I, the undersigned, being the parent or guardian of _____, who is a minor, certify that he has my full permission to enter into this Independent Carrier Agreement. I agree to be responsible for the performance of his obligations under this Agreement, and to pay or cause to be paid all monies owned [sic] to the Company by him hereunder.
DATE _____
_____
(PARENT OR GUARDIAN)
"The Petitioner was assessed as having made retail sales on the carrier-delivered newspapers. Petitioner timely filed a petition for reassessment stating that the assessment should be set aside because it made wholesale sales to the carriers."

order for the income derived from these sales also to escape *the retail business and occupation tax, W.Va.Code,* 11–13–2 [1971, 1975] an exemption must have existed. There was no exemption that would prevent the sales from being taxed under the old business and occupation tax, and if the appellee's argument prevails, then the individual carriers would have been liable for the business and occupation retail tax, and should have obtained business franchise registration certificates. Carriers certainly did not do this.

After the carrier begins delivery of his route, the manager continues to act as a liaison between the appellee and the carrier. Counseling and business tips are provided to carriers and the district sales manager coaches carriers on how to maintain good relationships with subscribers. Most importantly, however, the district sales manager acts as a liaison between the carrier and the subscriber. If a carrier stops delivery of newspapers to a subscriber, and the subscriber is unhappy about it, the subscriber calls appellee and speaks with the sales manager. It is the sales manager, a direct employee of the appellee, who works out the problem with the subscriber.

In addition, the sales manager aids in the collection of carriers' delinquent subscriber accounts by handling complaints and presenting the carriers' claims to the subscriber. If a youth carrier is not performing to the appellee's satisfaction, the carrier's parents will be called by the appellee's sales manager. If the performance is such that it causes the appellee difficulties, the sales manager has the authority to terminate a carrier's contract. Appellee's sales managers regularly check the bundle drop locations to see whether the carriers are delivering their routes. If a manager sees that a route is not being delivered by the appropriate time, he or she will call the carrier, and at times will transport the carrier from his home to the drop site in a vehicle owned by the appellee.

The appellee furnishes the carriers with receipt cards for collection purposes and with bound books in which to maintain their route and collection records. Furthermore, the appellee provides subscribers with receptacles called "tubes" in which newspapers are received as well as stakes upon which the tubes are mounted. These items are furnished free of charge on the customer's request and are installed by the carriers, who are not directly compensated for this service.

The carrier manual indicates that if carriers are "short" on newspapers, the papers will be dispatched by the district sales manager who keeps in touch with the appellee through a two-way car radio. Calls notifying the appellee of shortages, however, must be received by 6:30 a.m., which supports the argument that deliveries are to be made by a set time.

If a carrier fails to deliver altogether (or delivers late enough that it is reported as a non-delivery), appellee assumes responsibility and the district sales manager delivers the route. *The carrier is then billed for the suggested retail rate,* the delivery charge being the difference between the rate the carrier is usually billed and the suggested retail rate. This procedure, and paragraph 4 of the carrier agreement by which the carriers agree to deliver papers in a timely manner to all points on the delivery schedule supplied by appellee, are inconsistent with the appellee's position that the carriers may "sell" papers whenever they wish. Furthermore, if a carrier resigns and no replacement is available, the appellee delivers the route and makes the collections.

In the lower court the testimony and briefs focused on the question of whether the carriers are independent contractors. The real issue in this case, however, is whether the appellee is making a retail sale to home delivery subscribers. The proper decision of this fundamental issue is determined by whether, indeed, the appellee is making wholesale sales of newspapers to its carriers. The facts clearly indicate that the appellee is not making wholesale sales to the carriers regardless of how appellee has characterized the carriers' employment status.

## III.

The entire relationship between the appellee and its carriers centers in subscriber satisfaction. In a normal wholesaler/purchaser relationship, the wholesaler concentrates its sales efforts on its retailers or purchasers. However, in the daily operation of a newspaper, the newspaper publishing company concerns itself primarily with the subscribers who, under the appellee's theory of the case, are the carriers' customers. We find that the appellee's actions for the home delivery subscribers are inconsistent with the occurrence of a true wholesale sale between the appellee and the carrier. In tax matters, it is the substance, not the form of a transaction that determines tax liability. As we have stated previously:

> The actual rights and duties established by the terms of the taxpayers' transactions are controlling for the purposes of the business and occupation tax.

Syllabus Pt. 1, *H.O. Anderson, Inc. v. Rose*, 177 W.Va. 419, 352 S.E.2d 541 (1986).

The degree of control exercised by the appellee over the transactions supports the finding of a retail sale between the appellee and the customer. The typical youth carrier is about twelve-years-old; nonetheless, appellee asserts that these children are independent contractors by the terms of their contracts. Yet the district sales managers, who are employees of the appellee, play a vital role in the recruitment and supervision of the carriers. The replacement of an existing carrier is usually handled in one of two ways. Either the carrier will recommend a replacement or the appellee will actively recruit a new carrier. After a replacement has been found, the district sales manager will meet with the new carrier and his parents, and explain the operation of the business. This explanation includes a description of the billing procedures and suggested methods of collection. Under a carrier's contract, the appellee may terminate the carrier's services without qualification upon 15 days' written notice or within a shorter period, if both parties agree. Certainly, the appellee's ability to release a carrier effectively controls the carrier's method of operation. The right to fire is one of the most effective methods of control. *Cooper v. Asheville Citizen–Times Publishing Co., Inc.*, 258 N.C. 578, 129 S.E.2d 107, at 115 (1963).

The appellee's witnesses testified that the carriers are at liberty to charge the consumers any rate the carriers wish. Yet, the appellee publishes a rate schedule daily and its own witness agreed that this schedule is composed of the rates that are held out to the public as the rates that are charged for home delivery of the newspaper. A study of the advance payment scheme, or subscriber courtesy account, reveals that subscribers who pay in advance pay directly to Huntington Publishing Company. A credit is then made to the appropriate carrier's account. However, the credit is not made immediately as it would be for a truly independent merchant, but rather the carrier's account is credited on a bi-weekly basis. Thus we have a situation where payment is supposedly being made to a carrier for the purchase of "his" newspapers and "his" delivery service, but the payment is actually made directly to Huntington Publishing Company which then pays the carrier the difference between the wholesale and retail price.

## IV.

Under the circumstances described above, we cannot accept appellee's argument that carriers are purchasing newspapers from the appellee and selling them to subscribers. Even an "independent contractor" can act as an agent of a manufacturer/publisher, and can solicit orders, make deliveries, and do all things necessary to maintain an effective sales network for the retail product. In *Tyler Pipe Industries, Inc. v. Washington Department of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987), the U.S. Supreme Court confronted the issue of whether a showing of sufficient nexus for the imposition of a state tax on an out-of-state manufacturer could be defeated by showing that the taxpayer's representative was properly characterized as an independent contractor instead of an agent.

Although the case before us is not a nexus case, *Tyler Pipe* is instructive because it rejects the argument that there is a real distinction to be drawn in tax matters between agents and independent contractors. The fact that salesmen are independent contractors rather than employees of the company does not insulate the company from tax liability. As the U.S. Supreme Court pointed out in *Scripto v. Carson*, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960), which it cited and discussed in *Tyler Pipe*, "[t]o permit such formal 'contractual shifts' to make a constitutional difference would open the gates to a stampede of tax avoidance." 362 U.S. at 211, 80 S.Ct. at 621. Certainly, in the case before us, the carriers, even if they are independent contractors, are in reality sales representatives for the appellee, as were the "independent contractors" in *Tyler Pipe.*

Both appellant and appellee cite numerous cases on the issue of the status of newspaper carriers either as independent contractors or employees. Two representative examples of such cases cited by both parties are *Hann v. Times–Dispatch Publishing Co.*, 166 Va. 102, 184 S.E. 183 (1936) and *Richmond Newspapers, Inc. v. Gill*, 224 Va. 92, 294 S.E.2d 840 (1982). Appellant cites *Hann,* in which the Virginia Supreme Court found a carrier to be an employee of the newspaper and, therefore, covered by worker's compensation. Appellee cites *Gill,* in which the Virginia Supreme Court held that a carrier killed while delivering papers was an independent con-

tractor and, therefore, not entitled to recover workers' compensation. Although the court in *Gill* distinguished *Hann,* saying that the facts of the cases were quite different, indeed, the facts of these cases were nearly identical to each other, and to the facts in the case before us. These cases, and others like them cited by both parties,[4] all arise either in the context of workers' compensation claims or in a context where it is necessary to determine whether *respondeat superior* applies for a tort action. Although such cases make ample fodder for legal hairsplitting on the issue of the employment status of newspaper carriers, they do not resolve the issue in this case of whether the appellee makes true wholesale sales of papers to the carriers.

In *H.O. Anderson, Inc. v. Rose*, 177 W.Va. 419, 352 S.E.2d 541 (1986), we addressed the question of whether there was a bailment or a sale when the taxpayer company bought petroleum products from a supplier and delivered them to state agencies that were customers of the supplier. In that case, the supplier debited taxpayer's account when it picked up the product, and credited the account when it received an invoice from the state agency reflecting that the product had been delivered. Under the facts in that case, we held that the supplier had made a sale to the taxpayer, pointing out that once the taxpayer took delivery from the supplier, it was completely free either to deliver the product to the state agency and receive a credit from the supplier, return the product

---

**4.** Additional cases cited and argued by appellant in which carriers were found to be employees rather than independent contractors are *Cooper v. Asheville Citizen–Times Publishing Co.*, 258 N.C. 578, 129 S.E.2d 107 (1963) (*respondeat superior* in wrongful death action); *Texas Co. v. Ziegler,* 177 Va. 557, 14 S.E.2d 704 (1941) (*respondeat superior* in wrongful death action); *Nevada Industrial Commission v. Bibb,* 78 Nev. 377, 374 P.2d 531 (1962) (workers' compensation claim); *Hampton v. Macon News Printing Co.,* 64 Ga.App. 150, 12 S.E.2d 425 (1940) (*respondeat superior* in negligence action for motorcycle-inflicted injuries); *Globe Indemnity Co. v. Industrial Accident Comm'n of Cal.,* 208 Cal. 715, 284 P. 661 (1930) (workers' compensation claim); and *Press Publishing Co. v. Industrial Accident Comm'n of Cal.,* 190 Cal. 114, 210 P. 820 (1922) (workers' compensation claim).

Cases cited and argued by appellee in which carriers were found to be independent contractors rather than employees include *Moore v. Burriss,* 132 W.Va. 757, 54 S.E.2d 23 (1949) (*respondeat superior* in negligence action for auto injuries); *Mirto v. News–Journal Co.,* 50 Del. 103, 123 A.2d 863 (1956) (*respondeat superior* in negligence action); *Bernat v. Star–Chronicle Pub. Co.,* 84 S.W.2d 429 (Mo.App.1935) (workers' compensation claim); *Verrett v. Houma Newspapers, Inc.,* 305 So.2d 547 (La.App. 1974) (*respondeat superior* in negligence action); *Rathbun v. Payne,* 21 Cal.App.2d 49, 68 P.2d 291 (1937) (*respondeat superior* in negligence action); *Miami Herald Pub. Co. v. Kendall,* 88 So.2d 276 (Fla.1956) (*respondeat superior* in negligence action); *Greening v. Gazette Printing Co.,* 108 Mont. 158, 88 P.2d 862 (1939) (*respondeat superior* in negligence action).

to the supplier and get a refund, or sell the product to its own customers and *pay the supplier the amount of the wholesale debit.* 177 W.Va. at 424, 352 S.E.2d at 546.

Although appellee contends that once the carriers "purchase" their papers, they are free to sell them as and when they wish, this is not, in fact, the case. Should the carrier not deliver the paper to a subscriber, the sales manager delivers the paper and the carrier is charged the *full retail price,* not the "wholesale price" that the carriers normally pay to appellee. In *Anderson, supra,* if the taxpayer decided not to deliver to the client of the supplier, it was charged only the wholesale price by the supplier. Here, the carrier is penalized if he doesn't deliver on time to appellee's customers.

The appellee has attempted to create the appearance of making wholesale sales of newspapers to independent carriers while in substance retaining sufficient control to ensure that the carriers give satisfactory service to the ultimate retail customers. Appellee cannot have it both ways.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Kanawha County is reversed and the case is remanded with directions to enter judgment for the State Tax Commissioner.

REVERSED AND REMANDED WITH DIRECTIONS.