COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Annunziata and Senior Judge Cole
Argued at Richmond, Virginia


COUNTY OF SPOTSYLVANIA AND
 VIRGINIA MUNICIPAL GROUP SELF-INSURANCE
 ASSOCIATION/VML INSURANCE PROGRAMS
                                        OPINION BY
v.        Record No. 1679-96-2    JUDGE ROSEMARIE ANNUNZIATA
                                         JULY 15, 1997
BETTY C. WALKER


         FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

          William S. Sands, Jr. (Duncan and Hopkins,
             P.C., on brief), for appellants.

          No brief or argument for appellee.



     The County of Spotsylvania (County) appeals the decision of

the commission awarding compensation benefits to Betty C. Walker

(claimant).  There is no dispute that claimant suffered a

work-related injury by accident and was temporarily, totally

disabled.  The issue in this case is whether claimant was an

"employee" within the meaning of the Act, or is otherwise

excluded from coverage.  We find that claimant was not an

"employee" of the County and, therefore, reverse.

                              I.

     The County's Department of Social Services (DSS) receives

allocations of federal and state funds for the purpose of

purchasing various services approved by the Virginia DSS.  One

such service is the County's companion services program, designed

to assist low income elderly or disabled individuals with daily

living skills.  The County's use of the allocated funds within

the program is defined by the policies and regulations of the state DSS.  Under state guidelines, funds may be used to provide only certain needs.  Specifically, the companion services program is intended to address the client's "personal needs," not "heavy duty housework."  The state DSS establishes the maximum pay level for companion services providers, and the County determines the actual level of pay within those limits.  Companion services providers are paid by the County, which then obtains reimbursement from the state.

In March 1992, the County approved claimant's application to be a companion services provider.  The general terms of the relationship between the County and the service provider are contained in an "Individual Vendor Agreement."  This agreement sets forth the services the individual provider offers to render and the remuneration the County agrees to pay.  The agreement is not client-specific.  Specifically, it provides:

> This Agreement contains the terms under which purchasing will take place, but it does not mean that Social Services will purchase any services.  If Social Services wishes to purchase services it will present the Individual with a Purchase of Services Order which then becomes a part of this Agreement. The Individual shall provide services only when and as authorized by a Purchase of Services Order which has been accepted by the Individual.  Social Services may terminate the Purchase of Services Order prematurely for good cause by issuing a Purchase of Services Order indicating termination.
>
> The individual shall bill monthly on Vendor Invoice forms supplied by Social Services. The Individual shall bill Social Services and receive payment only for services authorized

by a Purchase of Services Order and only for services actually provided.

\* \* \* \* \* \* \*

The Individual states that the services described in this Agreement are not available from the Individual without charge. Any additional fee paid by the client or the client's family may only be with Social Services' permission for services not specified on the Purchase of Services Order or in accordance with Social Services' fee system as indicated on the Purchase of Services Order.

The Individual shall not subcontract or assign this Agreement to anyone else to provide any of the services under this Agreement without first obtaining written approval from Social Services. The Individual is responsible for the performance of the subcontractor.

\* \* \* \* \* \* \*

The Individual agrees to hold Social Services harmless from any claims for damages for any actions or inactions of the Individual or his agents or employees.

The agreement further requires the provider to give the County two weeks notice if the provider is unable to provide services as agreed.

Claimant's Individual Vendor Agreement describes the following services she offered to provide:

[p]rovide AM care (bath, dressing, ect. [sic]), prepare meals, transport to and from doctor[,] wash clothes, light house work.

Claimant was to be paid four dollars per hour and was limited to a maximum of fifteen hours per week.

- 3 -

County social workers administer the companion services program. Typically, an individual seeking aid contacts a social worker, who then meets with the prospective "client" to determine that person's need and income eligibility for the program. Once the County determines that the client qualifies, the social worker pairs the client with a particular provider. Where the client does not suggest a particular provider, the County seeks to match the client with a provider from a list of approved providers. The social worker contacts the prospective provider to discuss the needs of the new client. The prospective provider decides whether to accept the case. Providers may freely decline an offered assignment. If the provider accepts a case, the provider meets with the client, sometimes, but not necessarily, in the presence of the social worker, to discuss the details of the assignment. The client and the provider determine the specific roles of the provider and the specific times when the services will be provided. The client, not the social worker, chooses the provider.

Once the client selects a provider, the provider and the County complete a "Purchase Service Order," detailing the terms of the assignment as agreed to by the provider and the client and stating, inter alia, the services to be provided, to whom, and when. The social worker has no day-to-day supervisory responsibilities over the services provided. The social worker visits the client quarterly, unless a problem arises demanding

more immediate attention.  To be remunerated, the provider completes a "Vendor Invoice," documenting, <u>inter</u> <u>alia</u>, the services provided and hours spent.

In May 1995, the County arranged for claimant to provide services to a client, Mrs. Pugh.  Claimant could have declined to provide services for Mrs. Pugh, and Mrs. Pugh could have declined claimant as a provider.  Mrs. Pugh was "disabled and required assistance in daily living skills"; she was bedridden with "severe dementia" and required "total care."  The record, however, contains neither a "Purchase Service Order" nor a "Vendor Invoice" describing the specific services claimant provided Mrs. Pugh.  The social worker who had managed Mrs. Pugh's case did not testify.  In the course of lifting Mrs. Pugh into bed following a bath, claimant injured her back.

II.

The Workers' Compensation Act covers employees but not independent contractors.

> No definite rule has been established to ascertain whether the relationship with the principal is that of employee or independent contractor. It must be determined from the facts of the particular case in the light of well settled principles.  While several tests are applied to make the determination, the final test is the right of control.  The history of the Act clearly shows that the legislature did not have in mind as beneficiaries any persons other than those commonly understood as falling within a contractual relationship of employer and employee.  The classification of a person as an employee or an independent contractor is governed, not by any express provision of the Act, but by common law, and we must look to

it in determining who is an employee.

Hamilton Trucking v. Springer, 10 Va. App. 710, 714, 396 S.E.2d 379, 381 (1990) (citations omitted).  Determination of the relationship involves a mixed question of law and fact which is reviewable on appeal.  Richmond Newspapers, Inc. v. Gill, 224 Va. 92, 95, 294 S.E.2d 840, 841 (1982).  A person seeking benefits under the Act bears the burden of proving he or she is an "employee."  Behrensen v. Whitaker, 10 Va. App. 364, 366, 392 S.E.2d 508, 509 (1990).

The power or right of control is the most significant factor in determining the character of the relationship, and the most significant inquiry is whether the power or right to control the means and methods by which the result is to be accomplished has been reserved.  Gill, 224 Va. at 98, 294 S.E.2d at 843 (finding paper carrier not employee of newspaper); Intermodal Services, Inc. v. Smith, 234 Va. 596, 601-02, 364 S.E.2d 221, 224-25 (1988); Virginia Employment Commission v. A.I.M. Corp., 225 Va. 338, 347, 302 S.E.2d 534, 539-40 (1983); Craig v. Doyle, 179 Va. 526, 531, 19 S.E.2d 675, 677 (1942).

> If under the contract the party for whom the work is being done may prescribe not only what the result shall be, but also direct the means and methods by which the other shall do the work, the former is an employer, and the latter an employee.  But if the former may specify the result only, and the latter may adopt such means and methods as he chooses to accomplish that result, then the latter is not an employee, but an independent contractor.  So the master test is the right to control the work.

Gill, 224 Va. at 98, 294 S.E.2d at 843 (citations omitted).  The right to control results is not alone sufficient to establish an employer-employee relationship.  Id.  Indeed, the right of control over results does not distinguish an employee from an independent contractor; by definition of the relationship, a principal exercises certain control over results whether those results are accomplished by employee or independent contractor. The relevant and determinative distinction lies in the right to control the means and methods chosen to accomplish the result.

The written contract between the parties and the evidence concerning performance under that contract are factors which help "to elucidate the manner and degree of control."  Id.  Indeed, the "nature of the relationship the parties intended to create is one of the factors to be considered."  Id.

In the present case, the commission concluded that the County exerted the "requisite control over the claimant's activities" to render claimant an "employee."  The commission's decision was premised on the following findings with respect to the Independent Vendor Agreement: (1) the agreement granted the County the right to terminate claimant's services; (2) the agreement required claimant to give two weeks notice before ceasing to provide services; (3) the agreement established the services authorized to be provided; (4) the agreement set an hourly wage; (5) the agreement required claimant to obtain County approval before subcontracting the agreement; and (6) the

parties' use of the term "vendor" in the agreement was not relevant "since this terminology is designed clearly to establish that the [providers] are not employees and to distinguish them from other county employees."  The commission's decision was further premised on the following findings: (1) the County "determined the types of services to be provided" in placing limitations on "heavy housework" and the number of hours to be worked per week; and (2) the County "exercised oversight and control over the provision of services."[1]  We conclude that the commission's findings are insufficient, as a matter of law, to support a finding that claimant was an "employee" of the County.  None of the commission's findings evidences the right of control by the County over the means and methods by which claimant performed the services she contracted to provide.

There is no evidence that the County directed or controlled how services were to be performed.  No evidence shows that the County could direct, for example, how providers were to accomplish particular tasks, a particular order or manner of accomplishing tasks, or the tools or instruments, if any, used to accomplish a task.  To the contrary, the evidence shows that the County had no day-to-day supervisory responsibility and, unless problems arose, the social worker visited the client only four times per year.

---

[1]    The commission further found that claimant was not exempt from the Act as a "domestic servant."  See Code § 65.2-101(2)(f).

- 8 -

While claimant was paid by the hour, she controlled the actual number of hours she worked. She could freely accept or decline an offer from the County to provide services to a particular client, and the client could likewise decline to employ the provider. The maximum number of hours which providers could work and the specific rate of remuneration were functions of the County's fiscal constraints, not a reservation of control over the means and methods claimant could employ in providing services.

The County did not retain an absolute right to discharge claimant. Claimant could be discharged only for "good cause." Contrary to the commission's finding, such a limitation is "more characteristic of" an independent contractor relationship, and while our ultimate conclusion is not premised on this factor alone, it is a factor to be considered. Gill, 224 Va. at 100, 294 S.E.2d at 844.

We also note that, contrary to the commission's finding, the parties' characterization of claimant's relationship to the County as "vendor" is evidence of their intent to treat claimant as an independent contractor. While the parties' characterization of the relationship is not conclusive of the issue, the "nature of the relationship the parties intended to create is one of the factors to be considered." Id. at 98, 294 S.E.2d at 843.

To the extent the County had the right to control the

provision of services, it could control only the parameters of the service relationship, viz., the ends to be achieved. The relationship between claimant and the County was defined primarily by an agreement, the Individual Vendor Agreement, which set forth the general services claimant offered to provide and the rate at which the County agreed to compensate her. No term of that agreement authorized claimant to perform any work on behalf of the County. Rather, claimant's work was to be authorized by subsequent agreement, which would provide the terms of service and remuneration for a specific client. Contrary to the commission's finding, however, the County did not establish or control the services to be provided for a specific client or how the services were to be performed. Rather, the client's needs and the provider's ability or willingness to provide for those needs in the manner required by the specific client dictated the specific services to be provided.

The limitations the County placed on the type of services it would subsidize and the maximum number of hours per week it would compensate the provider merely set the bounds of the tripartite relationship. The County's role in that relationship was to administer the provision of services in compliance with state DSS guidelines; it facilitated the pairing of providers with clients who met the criteria specified by the state guidelines for participation in the program, and it provided funds to subsidize services provided to its low-income citizens. The County's role

did not relate to or affect the means and methods by which the services falling within those parameters were to be provided. Cf. Gill, 224 Va. at 101, 294 S.E.2d at 845 (placing no significance in fact that newspaper had right to control route carrier was required to follow: "The geographical description of the `area of primary responsibility' was merely a definition of the job territory . . . not a limitation upon the manner in which Gill served his customers.").

The requirements that claimant give two weeks notice before ceasing to provide services and obtain County approval before subcontracting the agreement relate, if at all, to the County's right to control the result sought to be accomplished, the provision of services, rather than the methods and means of their provision. Indeed, the provision in the agreement regarding subcontracting services further provides that once services are subcontracted, the provider is responsible for the performance of the subcontractor. In any event, even considering those factors as indicative of an employer-employee relationship, they alone are not conclusive.

In sum, there is no evidence to support a finding that the County had the right to control the means and methods by which claimant provided services. The County's right to control extended only to the parameters of the tripartite relationship and was, at most, oriented to effecting, generally, the provision of services to its low-income citizens. Contrary to the

dissent's position, we decline to infer a right to control means and methods from a right to control results. Such an inference would collapse the common law distinction between employees and independent contractors.

Accordingly, the commission's decision must be reversed.[2]

Reversed.

_____

[2] The County also contends that claimant is precluded from compensation under Code § 65.2-101(2)(f), which excludes "domestic servants." Finding that the commission's decision must be reversed on other grounds, we need not address this issue. We note, however, that the relevant inquiry under Code § 65.2-101(2)(f) is the employment relationship between the alleged "domestic servant" and the party for whom that person provides domestic service. The cases the County cites bear this out. Here, however, the issue is the employment relationship between claimant and the County; claimant does not suggest Mrs. Pugh was her employer. Accordingly, the body of law which excludes domestic servants from the protections of workers' compensation legislation is inapposite to this case.

Benton, J., dissenting.

"The [Workers' Compensation] Act protects 'employees,' as defined in the Act." Intermodal Services, Inc. v. Smith, 234 Va. 596, 600, 364 S.E.2d 221, 223 (1988). As pertinent to this case, "[e]very person . . . in the service of another under any contract of hire . . . , written or implied" is an employee under the Act. Code § 65.2-101.

> As a general rule, a person is an employee if [the person] works for wages or a salary and the [individual or entity] who hires [the person] reserves the power to fire [the person] and the power to exercise control over the work to be performed. The power of control is the most significant indicium of the employment relationship; other factors merely help to elucidate the manner and degree of control.

Richmond Newspapers, Inc. v. Gill, 224 Va. 92, 98, 294 S.E.2d 840, 843 (1982). The record unambiguously discloses that Walker was paid an hourly wage to "provide services only when and as authorized." However, the majority finds that the facts did not prove the requisite level of "control by the County over the means and methods by which [Walker] performed the services she contracted to provide." I disagree.

"'[T]he ultimate question is not whether the employer actually exercises control over the doing of the work, but whether [the employer] has the right to control.'" Hann v. Times-Dispatch Publ'g Co., 166 Va. 102, 106, 184 S.E. 183, 184-85 (1936) (citation omitted). The facts of each case are important in determining the issue of control. See id. at 106, 184 S.E. at

Furthermore, when the record contains credible evidence that supports the commission's factual findings, those findings are "conclusive and binding as to all questions of fact." Code § 65.2-706; see James v. Capitol Steel Constr. Co., 8 Va. App. 512, 515, 382 S.E.2d 487, 488 (1989).

The evidence proved that Walker was a "companion aide." The Director of Social Services testified that the County's Department of Social Services defined the scope of Walker's services and that the case worker, who was assigned to Pugh (the "client"), gave Walker her instructions. The director testified that the social worker initially would meet with the client to assess the client's needs. The social worker would then interview the companion aide to explain the authorization, discuss "all aspects . . . with the [companion aide]," and sign the forms. Typically, the case worker would introduce the companion aide to the client. Unless the companion aide was requested by the client, the social worker would choose which companion aide would be offered a particular assignment. Thus, the social worker had significant control over Walker's assignments and the number of hours she worked. Accord Sparlin Chiropractic Clinic, P.C. v. TOPS Personnel Servs., Inc., 387 S.E.2d 411, 412-13 (Ga. Ct. App. 1989) (holding that a person was an employee of a temporary placement agency because the agency paid him and "controlled his assignments").

The majority concedes that the County controlled the number

of hours Walker worked but dismisses that fact in its discussion of the elements of control on the ground that the reason for the limits was the County's "fiscal constraints."  Regardless of what the County's motivation was, however, the fact remains that the County controlled Walker's hours.  Indeed, every employer suffers from "fiscal constraints."

The evidence also proved that after the case worker assessed the client's needs, the case worker would discuss with the companion aide the services to be performed.  In the agreement between Walker and the County, Walker was required to "provide services only when and as authorized."  Moreover, the County's representative was required to monitor the progress and give direction "if there [were] difficulties or problems."  The County also had the power to discharge Walker for unsatisfactory services.  Thus, the instructions to the companion aide were obligatory terms and conditions of employment.

"'One of the means of ascertaining whether or not this right to control exists is the determination of whether or not, if instructions were given, they would have to be obeyed.'"  Hann, 166 Va. at 107, 184 S.E. at 185 (citation omitted).  The evidence establishes that the agreement gave the County the power and the right to discharge Walker if she disobeyed the County's instructions.  Thus, the County retained the "right to control." Id.

The majority states that the County did not control the

services Walker performed because the services were dictated by the client's needs.  The fact that an individual client's needs determined what services were required does not negate the inescapable conclusion that the content of the instructions given to Walker by the social worker governed the means and methods of performance.

The commission made the following findings, all of which are supported by credible evidence in the record:

> We find that the County Department of Social Services exerted the requisite control over [Walker's] activities.  When [Walker] applied for and was accepted as an approved companion aide, the parties signed a contract granting the County the right to terminate her services, requiring two weeks notice before ceasing to provide services, establishing the services authorized, and setting an hourly wage.  The County's social worker determined the types of services to be provided for the client.  For example, [Walker] was not authorized to do heavy housework, nor was she allowed to work for the client more than fifteen hours per week.  She could not find a substitute herself, but had to contact the social worker if she was unavailable.  In this case, when [the client's] regular aide was going on vacation, the social worker called [Walker] and assigned her to provide services to the client for two weeks.  Although the record suggests that [Walker] could have declined this particular assignment, this is the only element of control retained by [Walker], far outweighed by the other indicia of control retained by the County.
>
> [Walker] was not paid for the results of her work as an independent contractor, but was assigned to perform particular tasks for a particular length of time, for which she was paid on an hourly basis.  Although there was not daily supervision, the social worker exercised oversight and control over the

provision of services, visiting whenever there were problems and at least once every three months.  We do not find it relevant that the County constructed forms which refer to the companion aides as "vendors" and their time cards as "vendor invoices," since this terminology is designed clearly to establish that the companion aides are not employees and to distinguish them from other County employees who receive higher pay and benefits from a separate payroll.  We further find that the provision of companion care services is a regular part of the business of the County, which provides a wide range of services to its residents, including home-based care of the indigent disabled.

The evidence and the reasonable inferences to be drawn from the evidence proved that the County had the right to instruct Walker as to the work that was to be done and the manner in which that work would be performed.  The County also had the power to give direction if Walker and the client experienced difficulties or problems.  "Where reasonable inferences may be drawn from the evidence in support of the commission's factual findings, they will not be disturbed by this Court on appeal."  Hawks v. Henrico County Sch. Bd., 7 Va. App. 398, 404, 374 S.E.2d 695, 698 (1988).

Notwithstanding the requirement of "good cause" for termination, that factor was not an impediment to the commission's finding that Walker was not an independent contractor.  The Supreme Court clearly stated that "limitations upon . . . rights of termination may not be inconsistent with the existence of an employer-employee relationship."  Gill, 224 Va. at 100, 294 S.E.2d at 844.  Indeed, the evidence proved and the commission found that Walker "was assigned to perform particular

tasks for a particular length of time for which she was paid on an hourly basis."  The commission also found that the County specified the "types of services" Walker would provide for the client.  The evidence further proved, and the commission found, that if Walker was unavailable, she "could not find a substitute herself"; she had to contact the County so that the County could make alternative arrangements.  In view of the evidence establishing other substantial indicia of the County's right to control, the commission's findings are supported by credible evidence.

Although the majority states that the County "could control only the parameters of the relationship," no evidence in this record proved that the County could not, for example, specify in detail each service Walker was to provide and schedule the time of day and sequence in which each service was to be performed.  Indeed, the evidence undisputedly proved that the County had the power and the right to control because Walker could "provide services only when and as authorized."  Thus, the evidence proved the County clearly retained the right to specify the services.  In addition, the County's right to intervene if a conflict developed between the client and Walker, when viewed together with the right to authorize Walker's services, manifestly proved that the County retained the right to control the details of Walker's work, not just "the ends to be achieved."

Based on the evidence in this record, the reasonable

inferences that flow from the evidence, and the commission's findings, I would hold that Walker was an employee, not an independent contractor.  Thus, I would affirm the commission's award.

I therefore dissent.