Timothy L. **PENN,** Plaintiff,

v.

**VIRGINIA INTERNATIONAL TERMINALS, INC., et al., Defendants and Third-Party Plaintiffs,**

v.

**Perry H. ANDERSON, Defendant and Third-Party Defendant.**

No. 2:92cv685.

United States District Court,
E.D. Virginia,
Norfolk Division.

April 12, 1993.

Order Denying Reconsideration
or Certification May 26, 1993.

Charles A. Huffman, III, Huffman & Huffman, Newport News, Thomas B. Shuttleworth, Lawrence H. Woodward, Jr., Shuttleworth, Ruloff, Giordano & Kahle, Virginia Beach, VA, for Timothy L. Penn.

John M. Ryan, F. Nash Bilisoly, Thomas J. Duff, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for Virginia International Terminals, Inc., Grady Bowen and William B. Wright.

Robert W. Hardy, Robert A. Rapaport, Knight, Dudley, Dezern & Clarke, Norfolk, VA, for Perry H. Anderson.

## ORDER

PRINCE, United States Magistrate Judge.

Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) were filed by defendant and third-party-defendant, Perry H. Anderson ("Anderson"), and a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 was filed by defendants and third-party-plaintiffs, Virginia International Terminals, Inc. ("VIT"), William B. Wright ("Wright") and Grady Bowen ("Bowen"). An Order was filed on February 12, 1993, designating the undersigned United States Magistrate Judge to hear the motions and make recommendations for their dispositions. Thereafter, the parties consented to have a magistrate judge conduct all further proceedings in the case, including the trial, and order the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. All parties filed affidavits and other evidence to support or oppose the motions. Therefore, all of the motions will be treated as though filed pursuant to Federal Rule of Civil Procedure 56(b). They are now ready for decision.

### Nature of the Case

This case presents yet another in the seemingly endless variety of actions by trucking companies and truck owner-drivers to determine whether a driver is an employee, statutory employee, statutory co-employee or independent contractor for workers' compensation benefit purposes. *See generally McCall v. Bowater, Inc.*, 717 F.Supp. 1153 (W.D.Va.1989); *Hamilton Trucking v. Springer*, 10 Va.App. 710, 396 S.E.2d 379 (1990); *Intermodal Services, Inc. v. Smith*, 234 Va. 596, 364 S.E.2d 221 (1988); *Smith v. Horn*, 232 Va. 302, 351 S.E.2d 14 (1986); *Stover v. Ratliff*, 221 Va. 509, 272 S.E.2d 40 (1980).

The material facts are undisputed, although there is much dispute as to how those facts should be interpreted. The parties have agreed that all issues should be decided under Virginia Law. Virginia law provides that "whether there exists a relationship of master and servant, rather than one of independent contractor or subcontractor, is a question of law and not of fact." *Stover v. Ratliff,* 221 Va. 509, 511, 272 S.E.2d 40, 42 (1980). Accordingly, the Court will resolve this issue.

### Facts

Mediterranean Shipping Company ("Medline") is in the trade, business and occupation of transporting freight or cargo as a common carrier between points in the United States and overseas destinations.[1] Medline, through its agent, Containership, contracted with Envirex, Inc., another non-party, for the transportation of cargo from Wisconsin to Belgium. To partially perform this undertaking, Medline contracted with Anderson Trucking Service, Inc. ("ATS")[2] to transport the cargo from Wisconsin to Newport News, Virginia, the situs of VIT's terminal. Medline also contracted with VIT to receive the cargo from ATS, to handle it at the terminal, and to check it aboard the vessel RAFAELA S, which was operated by Medline and would be berthed at VIT's terminal. To perform the loading on board the vessel, Medline contracted with ITO Corporation of Virginia ("ITO"), a stevedore. Neither RAFAELA S nor ITO are parties to this action. Containership acted as agent for Medline in executing these contracts. The cargo subsequently was carried from Newport News to Belgium where it was delivered.

ATS transported the cargo from Wisconsin to Newport News through the use of two tractors and trailers. One of the tractors was owned and driven by plaintiff, Penn, and the other was owned and driven by defen-

dant/third-party defendant, Anderson. The trailers were owned or leased by ATS. After both tractor-trailer units arrived at VIT's terminal in Newport News on November 29, 1990, an accident occurred and Penn was injured. He filed this complaint against VIT and its employees, Wright and Bowen, alleging that their negligence caused the accident. VIT, Wright and Bowen filed a third-party complaint against Anderson alleging that his negligence caused or contributed to the accident. Penn then amended his complaint and added Anderson as a direct defendant. The defendants' motions raise the same issue: they maintain that they are immune from Penn's common law negligence claims. The basis for their alleged immunity is the Virginia Workers' Compensation Act, Code of Virginia §§ 65.2–100 *et seq.* ("VWCA"). VIT contends that Penn is its statutory-employee; Wright, Bowen and Anderson contend that Penn is their statutory co-employee. Penn maintains that he was at all times an independent contractor who is not covered by the VWCA.

The facts that are determinative of Penn's relationship to the defendants are those facts that determine his relationship to ATS. In fact, Penn and Anderson are related to ATS in the same way. ATS is an interstate for hire common carrier operating under a Certificate of Public Convenience and Necessity issued by the Interstate Commerce Commission ("ICC").[3] It transports goods for hire both interstate and internationally. In performing its transportation business, ATS uses its own tractors and employees and contracts with owner-operators like Penn and Anderson. Half of ATS' transportation business is done using its own tractors and employees.

The interstate trucking business is pervasively regulated by the ICC. The regulations provide the authority to perform autho-

---

**1.** The affidavit of Edward S. Broach, Traffic Manager for Containership Agency, Inc. ("Containership") (Docket Entry # 51) is the source of all evidence concerning the business of Medline, which no one disputes. Neither Medline nor Containership are parties to this action.

**2.** Defendant Perry Anderson and Anderson Trucking Service, Inc. are unrelated, except that

Perry Anderson was also either an independent contractor for, or an employee of, ATS as was plaintiff, Penn. ATS is not a party to this action.

**3.** The evidence concerning ATS' business is contained in the Affidavit of Philip M. Gerberding, its Risk Manager. (Docket Entry # 49.)

rized transportation in equipment not owned by the carrier, but only under conditions contained in 49 C.F.R. § 1057.11, which includes the condition that a written lease grant the use of the equipment and that the lease meet the requirements contained in 49 C.F.R. § 1057.12. The latter section provides that the "written lease required under § 1057.11(a) shall contain the following provisions," which are here quoted or paraphrased:

(a) The lease shall be made between the authorized carrier and the equipment owner.

(b) The duration of the lease shall be specified.

(c)(1) "The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease."

(4) "Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee."

(d) Compensation is to be specified.

(e) "The lease shall clearly specify" certain responsibilities, including "the cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused portions of such items.... [T]he authorized carrier lessee shall assume the risks and costs of fines ... for improperly permitted overdimension and overweight loads...."

(f) "The paperwork required before the lessor can receive payment is limited to log books required by the Department of Transportation and those documents necessary for the authorized carrier to secure payment from the shipper."

(g) Freight documentation is specified.

(h) "The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, ..."

(i) The lease shall specify that the lessor is not required to rent or purchase equipment from the carrier.

(j)(1) The lease shall provide for insurance coverage responsibilities.

(2) A provision is required if the lessor purchases equipment insurance from or through the carrier.

(3) A provision is required before deductions may be made by carrier for cargo damage.

(k) Provisions are required if escrow funds are required.

(*l*) Signing and maintenance of lease copies is provided.

(m) Special provisions.

49 C.F.R. § 1057.12.

Anderson and ATS entered into an Equipment Operating Contract on June 15, 1989.[4] (Plaintiff's Brief In Opposition To Defendants' Motion For Summary Judgment, Ex.H. (Docket Entry # 53.)) Penn and ATS entered into an identical contract on September 21, 1989.[5] (*Id.*, Exhibit A.) Penn's contract provided that it would continue until September 21, 1992. The contract included the following provisions, which are here quoted or paraphrased:

The parties are identified as ATS and Penn. Penn is described as a sole propri-

---

**4.** Paragraph 19 of the contract provides that unless it is terminated earlier under other provisions of the contract it "shall continue until June 15, 1989." The Court assumes that this was a scrivener's error and that the contract was in effect at the time of the accident, because it was so presented in the briefs and supporting affidavits.

**5.** The contract provides that it will be governed by the laws of the State of Minnesota, which appears to be ATS' place of business. (*See,* Affidavit of Philip M. Gerberding, Ex. A. (Docket Entry # 49.)) Nevertheless, the parties have agreed that the laws of Virginia are to be applied in determining the relationship between Penn and ATS.

etor.[6] The preamble to the agreement identifies the characterization of the parties and the equipment covered by the lease.

1. In this paragraph, "[Penn] agrees to furnish and to operate the above described Equipment together with drivers and all other necessary labor and to transport ... such commodities as [ATS] may from time to time make available to [Penn]." It is also provided that ATS will make every reasonable effort to make cargoes available for transport so that Penn can keep his equipment in regular use. No guarantees are made, however.

2. This paragraph describes compensation which would be due Penn.[7]

3. This paragraph states that the agreement is intended to create a relationship of independent contractors and not one between employer-employee. Neither Penn nor his employees are employees of ATS and none of them are entitled to workers' compensation benefits from ATS. Penn assumes full and complete responsibility for his own employees.

4. This paragraph tracks paragraphs (f) and (h) of 49 C.F.R. § 1057.12 regarding payments and deductions by ATS to Penn.

5. This paragraph contains Penn's recognition that ATS' business is regulated by the ICC, the DOT and various state and local governments. Recognition is made that the agreement form is prescribed by 49 C.F.R. § 1057. Penn assumes the responsibility of satisfying the regulatory requirements by maintaining the equipment as required, operating it as required, hiring only drivers who are qualified under the regulations, and not transporting unauthorized passengers. ATS has the right to verify Penn's compliance with these regulatory requirements, and to terminate the agreement immediately if Penn uses drivers who are not qualified under the regulations, or if Penn transports unauthorized passengers.

This paragraph also tracks paragraph (c)(1) of 49 C.F.R. § 1057.12 by placing the equipment under the exclusive possession, control and operational responsibility of ATS, but not "beyond that which is required to comply with the aforesaid regulations.... It is agreed by the parties hereto that [ATS] has no right to and will not control the manner nor prescribe the method of doing that portion of the operation which is contracted for in this Agreement by [Penn], except such control as is required by said regulations. [Penn] shall determine and direct its operations in all respects including, but not limited to, determination of days and time of operation, selection of routes of travel, arrangements for repair of the Equipment, and selection, discipline and discharge of drivers."

6. In this paragraph, Penn retains all responsibility for hiring and supervising his employees, purchasing and maintaining his equipment, and paying his own operating expenses, including those incurred while operating under ATS' certificate of authority, "and subject in each case only to any regulatory requirements which may be placed on [ATS] by various government agencies, and on [Penn] by Paragraph 5 of this Agreement."

7. In this paragraph, Penn retains responsibility for all withholding and employment taxes due for himself and his employees. He waives all claims against ATS for injury or death to himself, and he agrees to hold harmless ATS for any claims made against ATS by his employees. To fulfill these obligations, Penn agrees to maintain all proper workers' compensation coverage, to withhold and remit all taxes, and to provide ATS with evidence of his compliance.

8. This paragraph provides that ATS will not assume any of Penn's liabilities when not in the performance of a service for ATS. Penn agrees to maintain "Contingent Non–Trucking Liability" insurance covering both ATS and Penn as insureds.

6. The equipment covered by the lease is described in an attached addendum, which was not included with the exhibit.

7. "Compensation" is described in an attachment, which was not included with the contract exhibit.

ATS also agrees to maintain insurance as concerns shippers and the general public, as required by regulatory agencies, but Penn agrees to indemnify ATS for losses caused by Penn up to $750 in each of four loss categories.

9. This paragraph provides that ATS is not liable for damage to Penn's equipment.

10. This paragraph states that Penn will report all accidents to ATS and complete accident forms provided by ATS or its insurer.

11. In this paragraph, Penn agrees to return to ATS in good condition any equipment provided, but Penn is not required to purchase or rent any equipment from ATS.

12. This paragraph provides that either party may terminate the agreement immediately if the other commits a material breach.

13. This paragraph provides that ATS will furnish and Penn will display identification required by law or regulations, and Penn will return the identification upon termination of the agreement.

14. In this paragraph, Penn agrees to conduct his operations to assure customer satisfaction.

15. This paragraph states that if Penn fails to complete transportation of a cargo, ATS may use the same equipment and complete the performance.

16. This paragraph provides that payments made beyond those called for in the payment schedule will be determined on a case by case basis.

17. This paragraph states that the agreement is the entire agreement and may be modified only in a writing signed by the parties.

18. This paragraph provides that the laws of Minnesota will govern the interpretation and performance of the agreement, and the parties agree to arbitrate any disagreement or litigation. Further, the parties intend to create a relationship of Carrier and Independent Contractor and not one of Employer–Employee.

19. Finally, this paragraph states that either party may terminate the agreement after five days written notice. Otherwise, the agreement will terminate on September 21, 1992.

(Docket Entry # 53, Ex. A.) In addition to the provisions contained in the agreement, ATS has published a handbook which is provided to all of its company drivers and contract drivers. (Affidavit of Philip M. Gerberding, Ex. 1. (Docket Entry # 62.))

Several affidavits were filed, including those previously noted. In one of the affidavits of Philip M. Gerberding, he stated that under their operating agreements Penn and Anderson could engage in the business of transporting freight only for ATS. He said that neither could drive for any other company without permission from ATS. (Docket Entry # 49.) Neither of these statements is supported by the operating agreements. Under the agreements, the tractors owned by Penn and Anderson were assigned exclusively to ATS, and each agreed to provide drivers. Neither contract, however, required either Penn or Anderson to obtain permission to drive a truck for a company competing with ATS. Also, neither contract prevented either from declining a particular trip. On the other hand, ATS promised to do no more than to "exercise every reasonable effort" to make trips available. (Docket Entry # 53, Ex. A.) Penn testified that he would decline trips that were not sufficiently profitable to him. (*Id.*, Ex. E (deposition of plaintiff) at 78–79.)

Gerberding further stated in his affidavit that Penn was required to submit to a physical examination and driving proficiency tests, and that ATS could inspect his equipment and require necessary repairs or alterations. (Docket Entry # 49.) These ATS requirements were contracted for and covered in Paragraph 5 of the operating agreement. (Docket Entry # 53, Ex. A.) Gerberding also stated that ATS instructed Penn as to cargo availability, pick-up time, delivery time and delivery destination. ATS obtained all necessary licenses and permits and provided the trailer used in the haul. For the trip culminating in the accident, Gerberding stated that ATS contracted with Medline's agent for the transportation, set the rates, and obtained and paid for the necessary overdimension load permits. All of this was done

as part of ATS' business and ATS could have used its own employees to transport the cargo but elected to use Penn, a contract driver. Gerberding ended with the legal conclusion that Penn was engaged in ATS' trade. (Docket Entry # 49.)

Anderson's affidavit contained statements similar to those of Gerberding. He stated that the operating agreement prohibited him from driving for any other carrier. He submitted to a physical examination, and ATS inspected his tractor. ATS set the rates for cargo transportation, and placed identifying placards on his tractor. ATS decided what expenses to advance for a trip, required drivers to use ATS' fuel credit cards and to carry ATS' bobtail insurance. He was required to call ATS daily concerning ATS' driver needs. On the trip culminating in the accident, he and Penn were directed to contact a certain person before delivery.[8] He and Penn had received instructions concerning their next trips before completing the one to VIT. Anderson stated that he was engaged in ATS' business, and he was precluded from engaging in his own business, except as a driver for ATS. (Docket Entry # 48.)

In addition to portions of plaintiff Penn's deposition, his affidavit was filed. (Docket Entry # 54.) In it he states that when driving pursuant to his contract with ATS he selects his own routes of travel, except, as in this case, when the load is overdimensional. In those instances, the various states through which the load is to be hauled establish the routes. He stated that on one occasion he hired a driver to deliver a cargo. In that instance he withheld taxes, paid for the worker's compensation coverage and paid all of the expenses of the trip. He made his decision about whether to accept a trip from ATS upon the profitability of it. (Docket Entry # 54.)

Finally, an affidavit by an official of Envirex, the manufacturer of the cargo transported, states that Envirex' business is manufacturing and marketing. (Docket Entry # 55.) Envirex does not transport its own products. Furthermore, a second affidavit of Containership's Edward S. Broach states that Med-

line neither owns nor operates over-the-road trucks. (Docket Entry # 60.)

## Discussion

VIT, its employees Wright and Bowen, and Perry Anderson maintain that under various approaches to Virginia's workers' compensation statute and case law Penn's exclusive remedy is provided by the VWCA, and that they are immune from any common law claim he asserts against them. Penn maintains that he is an independent contractor not covered by the Act. More specifically, VIT, Wright and Bowen advance the following overlapping arguments:

1. If Penn and Anderson are statutory co-employees, then VIT is their statutory employer and Wright and Bowen are their statutory co-employees.

2. Penn is covered by the Act.

3. Penn, an employee of one independent contractor (ATS), may not bring a common law action against another independent contractor (VIT) when both are engaged in the business of the general contractor (Medline). In that situation they are both engaged in a subcontracted fraction of Medline's business. That is to say, VIT, Wright and Bowen are not "other parties" to Medline's business.

4. Whether Penn is ATS' employee or an independent contractor makes no difference. If he is an independent contractor, then he and VIT are fellow subcontractors engaged in Medline's business.

5. Penn is ATS' employee.

See (Docket Entry # 43, 50, 59.)

Anderson advances the following arguments which also overlap:

1. Penn and Anderson are statutory co-employees. As such, Penn may not maintain an action against Anderson. If Penn has no claim against Anderson, then VIT, Wright and Bowen have no third-party claim against Anderson.

2. ATS, using Penn and Anderson, was performing a subcontracted fraction of Medline's business with VIT.

8. The telephone number stated is for Containership.

3. Anderson is not a stranger to the work being performed. That is, he was not an "other party."

4. Penn and Anderson were both engaged in ATS' business, and ATS had the right to direct their activities.

5. Penn is an employee of ATS.

### Is Penn An Employee Of ATS?

■ The defendants say there is no decided case in Virginia on facts similar to those presented here. They urge the Court to follow the ruling in *Sharp v. Bailey*, 521 N.E.2d 368 (Ind.App.1988), a factually similar case decided by the Court of Appeals of Indiana. Support for this request can be found in *Joyce v. A.C. and S., Inc.*, 785 F.2d 1200 (4th Cir.1986). In *Joyce* the court said:

The Virginia Workers' Compensation Act was modeled after the analogous statute in Indiana. Virginia courts have therefore considered decisions interpreting the Indiana Act in construing the substantially similar statute in Virginia. *Barksdale v. H.O. Engen, Inc.*, 218 Va. 496, 237 S.E.2d 794, 796 (1977).

*Id.* at 1207 (footnote omitted).

In *Sharp v. Bailey, supra,* the parties, each driving a truck, collided, and Bailey was injured. Bailey owned the truck he was driving, and Sharp was employed by the owner of the truck he was driving. At the time of the accident, both trucks had been leased to Transport, Inc., and both were being operated in Transport's business. Transport was an ICC authorized carrier. Only a few facts concerning the lease agreements were noted in the opinion, but it may be presumed with reasonable assurance that the leases were drafted in compliance with 49 C.F.R. § 1057.12, as it then existed. Both leases required (a) the lessors to maintain their own workers' compensation coverage; (b) that the trucks would be used exclusively in the lessee's business; (c) that the drivers comply with ICC rules and lessee's rules;[9] (d) that lessee have the right to remove any unqualified driver; and (e) that the lessors would indemnify the lessee for loss from accidents. In a supplemental lease provision Transport provided the liability insurance for the trucks and drivers.[10] Payments under the leases were made to the lessors who in turn paid their drivers.

Without any discussion regarding the element of control over Bailey and Sharp by Transport, Inc., other than the recitation of the lease terms as stated above, the Indiana Court of Appeals said that the outcome was controlled by the decision of the Supreme Court of Indiana in *Transport Motor Express, Inc. v. Smith*, 262 Ind. 41, 311 N.E.2d 424 (1974). The court in *Sharp* then stated that the *single* trip lease in *Transport Motor Express*, "apparently to comply with ICC regulations, assigned the driver a route, required him to keep a log, . . . gave the lessee the right to replace the driver for violation of ICC or PSCI rules or regulations[, and provided that] the truck used the trip lessee's ICC and PSCI permit numbers." 521 N.E.2d at 370. The *Sharp* court stated that these facts alone were sufficient for the court in *Transport Motor Express* to find an employer-employee relationship was established, based upon an earlier decision in *Daniels v. Terminal Transport Company, Inc.*, 125 Ind.App. 28, 119 N.E.2d 554 (1954). The *Transport Motor Express* court determined "that it would be inconsistent to permit a motor freight carrier to execute written agreements covering the *employment* of drivers and the control of them required to meet ICC regulations and then permit the carrier to dispute those terms in the determination of whether a driver was an employee under the work[er]'s compensation law." 521

9. There is nothing in the Penn and Anderson leases that mentions ATS' own rules. Paragraph 6 of the leases state that they "shall determine the means and methods of the performance of all transportation services undertaken by [them] under the terms" of the leases. In paragraph 5 they agreed to perform in accordance with the rules of regulatory agencies. (Docket Entry #53, Ex. A.)

10. It is not stated, but it is presumed, that this was the type of liability insurance that Penn and Anderson were required to provide for themselves. Under 49 C.F.R. § 1057.12 the lessor is required to carry its own insurance for the protection of third parties and shippers.

N.E.2d at 370 (emphasis added). The court in *Sharp* then added:

> Pursuant to the decision in Transport Motor Express, supra, we hold that the control of Bailey required by the rules and regulations of the Interstate Commerce Commission and as reflected in the lease agreement constituted Bailey an employee of Transport for purposes of the work[er]s' compensation laws.

*Id.* It is clear, therefore, that in Indiana the exclusive possession, control and use of the equipment and driver imposed on a certified carrier by ICC regulations are sufficient, in and of themselves, to create an employer-employee relationship between the lessee and the lessor's driver.

In reaching its decision in *Sharp*, the Court of Appeals of Indiana also noted that subsequent to the decision in *Transport Motor Express*, other Indiana cases had expanded the determination of lessee liability on respondeat superior grounds to third parties injured by lessors' drivers. *Id.* For this the court cited *Rediehs Express, Inc. v. Maple*, 491 N.E.2d 1006 (Ind.App.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762 (1986), a case in which the court held a lessee liable to a third party on respondeat superior principles even though the lessor had stepped outside the terms of the lease at the time of the accident. In *Sharp* the court quoted from *Rediehs* as follows:

> An ICC carrier's liability for the equipment and the drivers covered by a leasing arrangement is not governed by the traditional common law doctrines of master-servant and respondeat superior. The independent contractor concept has been eliminated for lease arrangements under ICC regulations.

521 N.E.2d at 370 (quoting 491 N.E.2d at 1011).

The *Rediehs* case contains an informative discussion of the historical reasons behind the ICC regulation of certified carriers' leasing arrangements. *Rediehs* involved a claim by a third party against the lessee for injuries caused by the lessor's driver, who was not on Rediehs' business at the time of the accident, but was operating under Rediehs' authority to operate. The court said: "Lia-

bility of a carrier is fixed as a matter of policy upon the carrier owning operating authority in lease situations in order to enforce ICC regulations." 491 N.E.2d at 1010.

A similar result had been reached in *Proctor v. Colonial Refrigerated Transportation, Inc.*, 494 F.2d 89 (4th Cir.1974). Proctor was an employee-passenger of a truck owner-driver-lessor, who had leased his truck to Colonial. Proctor was injured in an accident caused by the lessor's negligence, and he brought a common law action against Colonial. The district court instructed the jury that if the lessor was an independent contractor, Colonial was not liable, but that if he was an employee of Colonial, the latter would be liable. The jury found for Colonial, and the Fourth Circuit reversed. After noting that the ICC regulations were promulgated by the Commission to correct widespread abuses incident to the use of leased equipment by carriers, the court stated:

> The statute and regulatory pattern clearly eliminates the independent contractor concept from such lease arrangements and casts upon Colonial full responsibility for the negligence of [the lessor] as driver of the leased equipment. Any language to the contrary in the lease agreement would be violative of the spirit and letter of the federal regulations and therefore unenforceable.

494 F.2d at 92.

On July 24, 1992, the ICC amended 49 C.F.R. § 1057.12, effective August 23, 1992. 57 Fed.Reg. 32905 (1992) (to be codified at 49 C.F.R. § 1057.12(c)(4)) (filed July 23, 1992). The ICC's announcement stated:

> TEXT: SUPPLEMENTARY INFORMATION: The Commission has amended the regulations dealing with written lease requirements at 49 C.F.R. § 1057.12(c), Exclusive possession and responsibilities, by inserting a new paragraph (4) confirming the Commission's view that the type of control required by the regulation does not affect 'employment' status and that it is not the intention of the regulations to affect the relationship between a motor carrier lessee and the independent owner-operator lessor. Inclusion of a specific

statement in the regulations was found to be necessary because certain State courts and administrative tribunals have determined that the regulations affect the relationship between the lessee and lessor.

*Id.*

The amendment states:

(4) Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 11107 and attendant administrative requirements.

*Id.*

The Court has discussed the Indiana cases at length because it appears that they are based upon an interpretation of the ICC regulations that were unintended by the ICC. Those cases find that an employer-employee relationship between lessee-lessor is mandated by the provision of 49 C.F.R. § 1057.12(c)(1), which places exclusive possession, control, use and operation of the leased equipment under the lessor.[11] This Court believes that is a misinterpretation of the regulation, especially with the hindsight provided by the 1992 amendment to 49 C.F.R. § 1057.12(c). Accordingly, the Court believes that it is unlikely that the Supreme Court of Virginia would adopt the holding of *Sharp v. Bailey, supra,* in interpreting the VWCA, and this Court will not follow *Sharp's* lead.

This conclusion, however, is not dispositive of the question: Is Penn an employee of ATS? The law in Virginia on this issue is not in dispute. In *Intermodal Services, Inc.*

*v. Smith,* 234 Va. 596, 364 S.E.2d 221 (1988), the court said:

The right of control is the determining factor in ascertaining the parties' status in an analysis of an employment relationship. And the right of control includes not only the power to specify the result to be attained, but the power to control the 'the means and methods by which the result is to be accomplished.' An employer-employee relationship exists if the party for whom the work is to be done has the power to direct the means and methods by which the other does the work. '[I]f the latter is free to adopt such means and methods as he chooses to accomplish the result, he is not an employee but an independent contractor.' The extent of the reserved right of control may be determined by examining the performance of the parties in the activity under scrutiny.

*Id.,* 364 S.E.2d at 224 (citations omitted).

Anderson, whose relationship to ATS appears to be identical to that of Penn, argues "that virtually all control over Penn, and his vehicle, lay with ATS."[12] (Reply Brief Filed On Behalf Of Perry Anderson In Support Of His Motion For Summary Judgment at 1. (Docket Entry # 61.) Anderson's argument is based upon the following facts:

1. Penn answered in his deposition that if he was asked to take a particular load and did not, ATS could terminate the contract. "They have the right to fire me."[13] (Docket Entry # 53, Ex. E at 78).

2. ATS controlled what loads were to be offered, when and where they would be picked up, and when and where the loads were to be delivered. Also, ATS provided the trailers.

---

**11.** Anderson specifically espouses that position. In his counsel's letter-memorandum of February 18, 1992 (Docket Entry # 63), he argues: "The facts of the *Sharp* case, are for the purposes of the summary judgment motion before this court, identical to the facts of this case. The plaintiff, Penn and the defendant Anderson were both under exclusive contract with [ATS] and were hauling freight in interstate commerce on behalf of [ATS] in furtherance of their [sic] business at the time of the accident in question. Those facts are undisputed by all parties. No further facts are necessary for deciding this case. *See, Sharp* and *Transport Motor Express, supra.*"

**12.** Neither Anderson nor Philip M. Gerberding, ATS' Risk Manager, both of whose affidavits were filed by Anderson, characterize the relationship between ATS and Penn and Anderson as one of employer-employee.

**13.** Immediately after this statement Penn re-explained that he could turn down a trip that he considered to be unprofitable. The agreement between Penn and ATS does not include refusal to take a particular trip as a cause for immediate termination of the agreement.

3. No one could drive Penn's truck without being qualified and approved by ATS. If a qualified driver was not provided, Penn's tractor would not be operated.

4. ATS' handbook, applicable to company drivers and owner-drivers, "sets forth in great detail the extensive control that ATS exerted over all of its drivers." *Id.* at 3.

5. After Penn's injury, his replacement driver was covered by workers' compensation coverage provided by Penn, because ATS required it.

6. The ATS handbook "mandates the contingent non-trucking liability insurance which must be carried and the physical damage insurance which must be carried and what insurance company it must be obtained from." *Id.* at 3–4.

7. The trip culminating in the accident involved an over-dimensional load. ATS acquired the permits for this load and "set the routes which had to be followed." *Id.* at 4.

8. Penn was instructed whom to contact before delivering the load.

9. ATS had the final say over whether Penn's tractor would pass inspection.

*See id.* at 2–5.

VIT, Wright and Bowen, assert that ATS' pervasive control over Penn is also established by these additional facts:

10. Penn underwent a physical examination and a driving proficiency test conducted by ATS, both required by DOT regulations.

11. ATS inspected Penn's equipment, although no regulations required it.

12. ATS provided all licenses and permits, and maintained liability, property damage, and cargo insurance.

13. ATS calculated Penn's compensation.

14. Penn's operating contract with ATS was exclusive, and he could not engage in the freight hauling business of another carrier without ATS' permission.

15. Penn was not guaranteed return loads.

(Reply Brief In Support Of Motion For Summary Judgment at 7–9. (Docket Entry # 59.))

The underlying theme of defendants' arguments is that Penn, who is presumed to be *sui juris,* is not entitled to the benefit of his bargain with ATS, because his bargain does not reflect reality. Penn, the owner of an expensive piece of equipment, a tractor, is also a professional driver. He has two valuable assets: a tractor and a skill. His economic need is to profit from both assets. As a sole proprietor he is free to seek any business arrangement his equipment, experience, business knowledge, reputation and energy qualify him to perform. One limitation he faces is that he has no certificate of public convenience and necessity issued by the ICC. ATS has such a certificate, but does not own enough trucks to satisfy its business needs. Penn and ATS each have something that could be beneficial to the other. It suited them to enter into an agreement. That is the essence of entrepreneurial enterprise. Penn would dedicate his tractor and a driver, who could be himself, to ATS' service for a set duration. ATS would obligate itself to make every reasonable effort to secure enough business to make it worth Penn's time and investment in his equipment. It happens that they are in a business that is highly regulated for the benefit of the public by both federal and state governments. The agreement that they would make must conform to government regulations. They executed such an agreement, and designated themselves as carrier and independent contractor. The agreement complies with those government regulations, and it is not a sham on its face. Only if in reality they execute that agreement in a different way will it be something other than what it purports to be.

None of the indicia of control advanced by defendants, separately or in the whole, would justify a conclusion that ATS had such control over Penn's execution that he was in fact an employee. The fact that ATS would tell Penn when and where to pick up a load, and when and where to deliver it is not sufficient control to establish an employment relationship. ATS could hardly serve its customers' needs if this was left to the discretion of its drivers. If a shipper requested, say, a parcel delivery service, to pick up a package for delivery across the country the next day

before a certain time, it could not be seriously argued that the delivery service became the employee of the shipper. Nor would that change if the shipper directed the delivery service to notify the consignee before making the delivery.

Penn contracted to provide a tractor and driver qualified by ICC standards. ATS was given the right to verify the qualifications. It chose to do this by inspecting the tractor and testing the driver. If ATS permitted an unqualified tractor or driver to operate under its authority it would be ATS that would suffer the consequences. Its right of verification was a legitimate business need, not an act of control over Penn. It would be the same as if an owner of property contracted to have a structure built by a contractor, and engaged an architect or engineer to check on the contractor's work, the contractor would not thus be converted into the owner's employee.

Penn's response in his deposition that he could be fired if he declined to accept a trip cannot be considered standing alone. It is contrary to both the terms of the agreement and not true in fact. It is clear that Penn misspoke. He explained that he had the right to decline a trip if it would not be profitable. No evidence to the contrary was offered.

ATS' handbook has been greatly over-represented by Anderson. The agreement provides that ATS will, in accordance with ICC regulations, maintain its own public liability, property damage and cargo insurance for the protection of shippers and the general public.[14] Penn is required to maintain "Contingent Non–Trucking Liability." (Docket Entry # 53, Ex. A at 4.) The handbook announces to owner-operators where such coverage may be obtained and at what price. (Gerberding Affidavit, Docket Entry # 62, Ex. 1 at "Contract Services".) Anderson's statement that the handbook requires from where the coverage is to be obtained is simply untrue. Also untrue is the statement that the handbook sets forth in great detail the extensive control of ATS over Penn. The fact that Anderson did not point out examples of this great detail speaks volumes. The handbook is basically informational. For example, the fuel and tire sections detail the procedures to be followed if the owner-operator chooses to make purchases on the road for the account of ATS rather than for cash or the account of the owner-operator. These are privileges made available to the owner-operators. They afford the owner-operators with lower prices based upon ATS' buying power, and it relieves the owner-operator from carrying cash or arranging for his own credit. At the conclusion of the trip such expenses incurred by an owner-operator would be deducted from his compensation.

The agreement provides that Penn must provide workers' compensation coverage for his employees. Attached to his agreement is an election to reject coverage for himself. This attachment recognizes, however, that pursuant to the agreement Penn must provide coverage for his employees. Anderson argues that the fact Penn obtained workers' compensation coverage for his replacement after he was injured demonstrates the control ATS had over him. This argument is frivolous because it ignores Penn's power to reject coverage for himself, regardless of ATS' available coverage.[15]

The load being delivered before the accident was overdimensional. Consequently, permits were required from each state, and each state would designate the route to be taken by that load. Anderson stated that ATS set the routes that Penn had to follow, thus providing further evidence that ATS controlled Penn's operation. Anderson clearly misstated the fact. Even so, that ATS, and not Penn, obtained the overdimensional load permits does not evidence control by ATS over Penn's operation. It evidences prudence and efficiency by ATS.

**14.** That ATS did this is presented as one of the indicia of control.

**15.** It may also be suggested that ATS' requirement that Penn provide coverage for his employees is evidence that ATS did not intend an employer-employee relationship with Penn or his subordinates. Since ATS did not allow Penn's employees to elect coverage under ATS, Penn's discretion in choosing coverage for himself, and his control of providing coverage for his employees, certainly can not be considered an element of ATS' control over Penn.

Finally, VIT argues that control over Penn is indicated by the fact that ATS would initially calculate the compensation to which he was entitled based upon a percentage of the gross revenue from the haul. This argument is frivolous in that it does not acknowledge that the same approach would be feasible for use with an independent contractor. VIT also argues that because Penn was not guaranteed a return trip that is evidence of control. However, it is evidence only of the terms of the agreement.

For the reasons stated, the Court FINDS that plaintiff Penn was an independent contractor and not an employee at the time of his injury.

### As An Independent Contractor Was Penn, Nevertheless, Subject To The VWCA?

■ Defendants argue that even if Penn is an independent contractor he and they were engaged in performing subcontracted fractions of Medline's contract with Envirex. They contend that subcontractors of a main contract fall within the purview of the VWCA. There are a number of tests followed in Virginia to determine if a worker is covered by the VWCA. *Shell Oil Co. v. Leftwich*, 212 Va. 715, 187 S.E.2d 162, 168 (1972), is representative of one such test. In that case the court held that a worker is covered if he is performing an activity that is part of the employer's trade, business or occupation, *and* if normally in that trade, business or occupation the activity is carried on by employees. There is an exception to that test, however, that is recognized in *Shell Oil.* The exception is that when the work is a subcontracted fraction of a main work activity it does not matter if the work activity is normally carried on by employees. Thus, in *Smith v. Horn*, 232 Va. 302, 351 S.E.2d 14 (1986), Knox Creek Coal Company was in the business of coal production, contracting with others for the mining of the coal. It contracted with Carrie Coal Company and Potter Coal Company to mine and haul coal from coal mines operated by Knox Creek Coal to

its processing plant. Smith, driving for Carrie Coal, and Horn, driving for Potter Coal, collided while hauling Knox Creek Coal, and Smith was injured.[16] He sued Horn who claimed the immunity of a statutory co-employee. The court held that *Anderson v. Thorington Construction Company*, 201 Va. 266, 110 S.E.2d 396 (1959), *appeal dismissed,* 363 U.S. 719, 80 S.Ct. 1596, 4 L.Ed.2d 1521 (1960), was controlling.

In *Anderson,* an engineering firm and a construction firm individually contracted with a turnpike authority to participate in the construction of a turnpike. Anderson, an employee of the engineering firm, was injured as a result of the negligence of the employees of the construction firm. He sued the construction firm for damages. The court held that the engineering firm and the construction firm, both independent contractors, were engaged in the construction of the turnpike, which was part of the trade, business or occupation of the authority. Neither was a stranger to the work, i.e., neither was "an other party", and therefore, both of the independent contractors, the authority, and their employees were under the umbrella of the VWCA. *Id.,* 110 S.E.2d at 400.

In *Smith v. Horn, supra,* the coal hauling case, the court rejected Smith's argument that *Anderson v. Thorington,* the turnpike case, had been superseded by the *Shell Oil* test.[17] Smith argued that *Shell Oil,* not *Anderson,* controlled, because the hauling performed by Carrie Coal and Potter Coal was not normally carried on by Knox Creek Coal through its own employees. Finding that the *Shell Oil* test was not applicable, the court said:

> The express exception to the test requires that it not be applied 'where the work is obviously a subcontracted fraction of a main concern.' The trial court found, as a factual matter, that Knox Creek's business was the mining, processing, and selling of coal. The contracted work performed by Carrie and Potter, mining and hauling coal

---

**16.** A third vehicle was involved, but its existence is unimportant in the decision.

**17.** Once again, the *Shell Oil* test is that the worker is covered by the VWCA if his work is in

performance of the trade, business or occupation of the employer, and is the kind of work normally performed by the employees of the employer.

to Knox Creek's plant for processing, was unquestionably a fraction of this main business concern. As this case falls within the exception, we need not reach the question whether the business was normally carried on through employees rather than independent contractors.

351 S.E.2d at 17–18. It is apparent, therefore, that the *Shell Oil* test and the subcontracted fraction test run on parallel tracks without collision. The latter, however, prevails over the former.

In the case before the Court, defendants argue forcefully that *Anderson v. Thorington, supra,* and *Smith v. Horn, supra,* control, because Penn, Anderson and VIT were all performing subcontracted fractions of the main contract between Medline and Envirex. Undoubtedly, they were. Penn does not even contest that he was performing a subcontracted fraction.[18] Medline had contracted with Envirex to transport the cargo from Wisconsin to Belgium. Medline subcontracted the over-the-road portion of the contract to ATS. ATS subcontracted part of that undertaking to Penn and Anderson. Medline also subcontracted to VIT the receipt and handling of the cargo in Newport News. Under the previously cited cases, it would appear that the subcontracted fraction test would apply requiring a holding that Medline, ATS, Penn, Anderson, VIT and ITO, and their employees are all under the umbrella of the VWCA.[19] If so, they would all be immune from Penn's common law negligence action.

Plaintiff argues that another recognized exception prevents the application of the subcontracted fraction test in this case. In *Intermodal Services, Inc. v. Smith,* 234 Va. 596, 364 S.E.2d 221 (1988), Smith was a self-employed owner of a tractor-trailer unit. He had leased the tractor to ITS, a long-haul trucking business, to pull trailers not owned

by him. On the day of the accident, while waiting for the "paperwork" to be completed before he could start on a trip for ITS, he was asked by ITS' dispatcher if he would move some trailers for Intermodal Services, a business located a short distance from ITS. Intermodal Services operated a rail-highway exchange facility, which involved loading and unloading trailers on and off railway flatcars. These trailers were temporarily stored in the yard at the exchange facility. When the yard became full, a satellite yard about one-tenth of a mile along a public highway was used. Within the principal storage yard Intermodal Services used its own tractor to move the trailers, but that tractor was not insured for use on public roads, and it could not be used to haul trailers to the satellite yard. When the need arose to haul trailers to the satellite yard Intermodal Services' manager would notify ITS' dispatcher. Smith agreed to drive for Intermodal Services while waiting for his trip for ITS. The ITS dispatcher told Smith that he would be paid $10 to $12 per trailer. Smith had transferred about a dozen trailers to the satellite yard when he was injured in a collision with Intermodal Services' yard tractor. Smith received workers' compensation benefits through ITS' coverage, and he sued Intermodal Services and its yard driver for common law damages. The defendants argued that they were immune, because Smith was either Intermodal Services' employee or statutory employee, or if neither, that they were not "other parties" under the Act against whom Smith could maintain an action. First, the court held as follows:

The Act protects 'employees,' as defined in the Act. Nowhere does an independent contractor who himself is injured in an industrial accident come within the terms of the Act. *Baker v. Nussman[ & Cox],* 152 Va. 293, 302, 147 S.E. 246, 249 (1929).

**18.** Plaintiff's argument that the "delivery cases" apply is unpersuasive. *Hipp v. Sadler Materials Corp.,* 211 Va. 710, 180 S.E.2d 501 (1971), *Burroughs v. Walmont,* 210 Va. 98, 168 S.E.2d 107 (1969), and *Buffalo Shook Co. v. Barksdale,* 206 Va. 45, 141 S.E.2d 738 (1965). All involve truck drivers making deliveries of materials to manufacturing or construction sites. The court held in each case that the drivers were not barred by the VWCA *viz-a-viz* claims against the contrac-

tors for injuries received while making the deliveries.

**19.** At oral argument, counsel for VIT, Wright and Bowen reluctantly conceded that the subcontracted fraction test would also bring under the umbrella a garage operator in Ohio who may repair a tire on Penn's tractor on the trip.

In other words, independent contractors or subcontractors may not be 'employees' within the meaning of the Act. *Stover v. Ratliff,* 221 Va. 509, 511, 272 S.E.2d 40, 42 (1980). 'This result obtains because the Act applies to the contractual relationship of master and servant.' *Id.* The Act 'does not undertake to change, as between themselves, the rights of owners and independent contractors'; it 'leaves that relationship as it was at common law and we must look to [the common law] in determining who is master and who is servant.' *Crowder v. Haymaker,* 164 Va. 77, 79, 178 S.E. 803, 804 (1935).[20]

*Intermodal Services,* 364 S.E.2d at 223–224. Then the court examined the evidence and concluded that Intermodal Services was not Smith's employer, because it did not control the manner of his performance. The court also rejected the argument that the Act was intended to make an independent contractor a statutory employer when he did not qualify as a common law employee, saying that the contrary had been held in a long line of cases. *Id.,* 364 S.E.2d at 225 (citing *Baker v. Nussman & Cox,* 152 Va. 293, 147 S.E. 246 (1929); *Crowder v. Haymaker,* 164 Va. 77, 178 S.E. 803 (1935); *Craig v. Doyle,* 179 Va. 526, 19 S.E.2d 675 (1942); *Stover,* 221 Va. 509, 272 S.E.2d 40; *Richmond Newspapers v. Gill,* 224 Va. 92, 294 S.E.2d 840 (1982)). Next, the court noted that "the phrase 'work[er] employed in the work,' to whom compensation benefits are owed, refers to employees, not the subcontractor himself." 364 S.E.2d at 225. Finally, the court held that it is of no significance that defendants were not "other parties" within the meaning of the Act, because since "the Act as a whole does not apply to the plaintiff under these circumstances, no individual section of the Act is applicable either." *Id.* at 226.

Defendants argued orally that *Intermodal Services* is an aberrational decision reached on a tight reading of the facts, and that its precedential value has been eroded in subsequent cases. The Court has reviewed the subsequent cases that cite *Intermodal Services* and disagrees with defendants' argument. *See generally Metropolitan Cleaning Corp. v. Crawley,* 14 Va.App. 261, 416 S.E.2d 35, 37 (1992); *Behrensen v. Whitaker,* 10 Va.App. 364, 392 S.E.2d 508, 510 (1990); *Counts v. Stone Container Corp.,* 239 Va. 152, 387 S.E.2d 481, 484 (1990) (distinguishing *Intermodal Services* ); *Evans v. Hook,* 239 Va. 127, 387 S.E.2d 777, 779 (1990) (distinguishing *Intermodal Services* ); *Rasnick v. Pittston Co.,* 237 Va. 658, 379 S.E.2d 353, 355 (1989) (following *Intermodal Services* ). The Court also rejects the defendants' argument that attempts to distinguish the subcontracted fraction test cases from *Intermodal Services.*[21] Defendants also argue that the subcontracted fraction test trumps the *Intermodal Services* test. That is to say, they argue that a self-employed independent contractor is covered by the Act if he is performing a subcontracted fraction of a main contract. Nothing supports that argument. The Court also rejects defendants' argument that when an independent contractor is performing work that is part of the trade, business or occupation of the general contractor, he is a statutory employee. That argument is contradicted by *Intermodal Services.* Furthermore, in each of the cases cited by defendants in support of this argument the plaintiff or claimant was an employee of a general or independent contractor, not the independent contractor himself.[22] The Court

---

**20.** In *Stover v. Ratliff, supra,* the court held truck drivers who were independent contractors or subcontractors "were not countable as employees within the meaning of the [Act]." 272 S.E.2d at 42.

**21.** Defendants argue that *Intermodal Services* is not a subcontracted fraction case. The Court disagrees. The main contract was between Intermodal Services and Southern Railway Company for the operation of a rail-highway exchange facility. The subcontracted fraction was the contract between Intermodal Services and Smith to move trailers to the satellite yard.

**22.** In fact, two of the cases relied on by defendants involve suits by employees of general contractors against subcontractors, the inverse of the case under consideration here. And, while these two cases may be construed as speaking generally to the issue addressed within this opinion, they are not controlling precedent.

holds that the rationale of *Intermodal Services* controls the decision in this case as well.

In conclusion, the Court FINDS that plaintiff is an independent contractor, not an employee of ATS, and not a statutory employee of VIT or a statutory co-employee of Anderson, Wright or Bowen. Consequently, the Court further FINDS that Penn is not covered by the VWCA. Accordingly, it is ORDERED that the motions for summary judgment of Anderson, VIT, Wright and Bowen be, and they hereby are, DENIED.

## ORDER

This case presented the issue of whether a truck owner-driver is an employee, statutory employee, statutory co-employee or independent contractor for workers' compensation benefit purposes. An Order was entered on April 12, 1993, finding that plaintiff, Timothy L. Penn, was an independent contractor at the time of his injury, and denying defendants' motions for summary judgment.

The motions for summary judgment were based upon defendants' contentions that plaintiff was an employee of Anderson Trucking Service, Inc. ("ATS"), which, under the Virginia Workers' Compensation Act and the facts of this case, made him a statutory employee of defendant Virginia International Terminals, Inc. ("VIT"), and a statutory co-employee of defendants William B. Wright ("Wright") and Grady Bowen ("Bowen"), both employees of VIT, and a statutory co-employee of defendant Perry H. Anderson ("Anderson"), who had a relationship with ATS identical to that of plaintiff.

If the Court had found that plaintiff was an employee of ATS, the exclusive remedy bar of workers' compensation would have applied, the defendants' motions would have been granted, and the case would have been

concluded. Since this was not the Court's finding, Anderson filed a Motion For Reconsideration on April 23, 1993, praying for reconsideration, or in the alternative for an order certifying the issue to the Supreme Court of Virginia pursuant to Rule 5:42(a) of the rules of that court. VIT, Wright and Bowen filed a Motion To Adopt on April 26, 1993, which joined in Anderson's motion. At the same time, VIT, Wright and Bowen filed a Motion For Certification Of Order, in which they pray for an order certifying this matter for immediate appeal to the Court of Appeals for the Fourth Circuit pursuant to 28 U.S.C. § 1292(b). Plaintiff filed a Brief In Opposition to defendants' motions on May 7, 1993.[1] In the meantime, on April 30, 1993, an Order On Supplemental Initial Pretrial Conference was filed establishing a discovery schedule and setting the case for trial on September 7, 1993.

The Court has considered the motions and the memoranda filed by the parties and hereby DENIES defendants' motion for reconsideration.

The reason advanced by defendants for certification to the Supreme Court of Virginia is based upon the argument that the law of Virginia, established in *Board of Supervisors v. Boaz*, 176 Va. 126, 10 S.E.2d 498 (Va.1940), is that any construction of the Indiana workers' compensation act by any court in Indiana will be adopted in Virginia. Brief in Support of Motion for Reconsideration, received April 23, 1993, at 3. Defendants previously cited in their briefs in support of motions for summary judgment *Sharp v. Bailey*, 521 N.E.2d 368 (Ind.App. 1988), a case factually similar to this case. They now argue that the Court erred in concluding that *Sharp* would not be followed in Virginia.[2] In fact, they argue that because that case is factually similar to this one, and because there is no Virginia case with the

---

1. Plaintiff's brief mischaracterized Anderson's motion as one for certification to the Court of Appeals for the Fourth Circuit instead of one for certification to the Supreme Court of Virginia.

2. In the Court's opinion order of April 12, 1993, *Sharp v. Bailey* and other Indiana cases were

discussed in some depth, and the Court held that it did not believe that the Supreme Court of Virginia would adopt the law of that case as the law of Virginia. The Court found instead that the Virginia cases led to the conclusion that plaintiff was an independent contractor.

same facts, this Court is compelled by *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to follow it.[3] The Court does not believe that the judicial process is so circumscribed.

The motion to certify the issue to the Supreme Court of Virginia as presented is in effect a petition for a writ of error or appeal from a United States District Court to the state supreme court.[4] Had the defendants previously moved for certification instead of summary judgment, the Court may have been persuaded to grant the motion. They did not adopt that course of action, however, and the Court believes that it is inappropriate for defendants to utilize the certification process as a means for an advisory appeal.[5] In any event, the Court believes that it is an abuse of the federal judicial system and would be an abuse of the Virginia certification rule to certify an issue presented to and decided by a federal court.[6] The motion to certify the issue to the Supreme Court of Virginia is therefore DENIED.

Furthermore, the motion of VIT, Wright and Bowen for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) is DENIED, because the Court is not of the opinion that its order of April 12, 1993 is one "to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially ad-

vance the ultimate termination of the litigation...."

---

**3.** Defendants make no argument that the Court's analysis of the Virginia cases interpreting the Virginia Workers' Compensation Act is flawed.

**4.** This Court would have to decide to certify, and the Supreme Court of Virginia would have to decide whether to accept the certification. It is indeed ironic that the VIT defendants would join in Anderson's motion after they elected to remove the case from the jurisdiction of the state courts.

**5.** If the certification was granted and accepted, the nonprevailing party or parties in the Supreme Court would then be entitled to appeal to the Court of Appeals for the Fourth Circuit after this Court had applied the answers to the certified issues and then had tried the case to a conclusion or granted summary judgment. But to what avail? Would the Fourth Circuit be asked to overrule the Supreme Court of Virginia on the certified issue of Virginia law?

**6.** The Court has reviewed numerous cases in which the certification procedures of Rule 5:42 were applied and can find no example of a court certifying an issue after it had rendered a decision in the case. *See, e.g., Beach Robo, Inc., v. Crown Cent. Petro. Corp.*, 860 F.2d 606 (4th Cir. 1988); *National R.R. Passenger Corp. v. Catlett Vol. Fire Co.*, 241 Va. 402, 404 S.E.2d 216 (1991); *Lee–Warren v. School Bd.*, 241 Va. 442, 403 S.E.2d 691 (1991); *Bulala v. Boyd*, 239 Va. 218, 389 S.E.2d 670 (1990); *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 374 S.E.2d 55 (1988); *Beach Robo, Inc., v. Crown Cent. Petro. Corp.*, 236 Va. 131, 372 S.E.2d 144 (1988); *Commonwealth v. American Booksellers Ass'n*, 236 Va. 168, 372 S.E.2d 618 (1988); *Aetna Cas. & Sur. Co. v. Dodson*, 235 Va. 346, 367 S.E.2d 505 (1988); *School Board v. United States Gypsum Co.*, 234 Va. 32, 360 S.E.2d 325 (1987). Accordingly, the Court will not set such a precedent here.